Argued January 29; reversed May 20, 1941

# HINISH *v.* MEIER & FRANK CO., INC., ET AL.

(113 P. (2d) 438)

Before KELLY, Chief Justice, and BELT, BAILEY, LUSK, RAND and ROSSMAN, Associate Justices.

*W. K. Royal* and *R. F. Hollister*, both of Portland, for appellant.

*Borden Wood*, of Portland (McCamant, Thompson, King & Wood, of Portland, on the brief), for respondents.

*W. S. U'Ren* and *John F. Logan*, both of Portland, amicus curiae.

LUSK, J. This is an action to recover damages caused by the defendants' invasion of the plaintiff's right of privacy.

The circuit court sustained a demurrer to the complaint, and, the plaintiff refusing to amend, entered judgment for the defendants from which this appeal is taken.

The complaint alleges: The defendant, Meier & Frank Company, Inc., is an Oregon corporation engaged in the general mercantile business, as a part of which it maintains an optical department. The defendant, Kenneth C. Braymen, is the manager of the optical department.

On February 28, 1939, the defendants, without plaintiff's knowledge or consent, signed his name to the following telegram which they caused to be sent to the governor of the state of Oregon:

"GOVERNOR CHARLES A. SPRAGUE

- 1939 FEB 28 PM 9 36

"THERE IS NO DEMAND FOR OPTICAL BILL SEVENTY EXCEPT BY THOSE WHO ARE FINANCIALLY INTERESTED IN ITS PASSING IT IS NOT A BILL SET OUT BY THE PEOPLE I URGE YOU TO VETO IT -

" - GEORGE HINISH 2810 NE 49 AVE."

It is alleged that Bill Seventy referred to in this message was a bill passed by the Oregon legislative assembly, which, had it been approved by the governor and become a law, would have prevented the defendant Meier & Frank Company, Inc., from continuing to engage in the business of fitting and selling optical glasses to the public.

It is further alleged that the plaintiff is a Classified Civil Service Employe of the United States Government, that as such he is prohibited by statute and the rules duly promulgated by the United States Civil Service Commission from engaging in political activities, and that the defendants, by sending the said telegram, jeopardized plaintiff's position and his right to receive a pension upon reaching the age of retirement.

It is alleged that the plaintiff suffered mental anguish as the result of defendants' wrongful act, and damages are sought in the sum of $20,000, of which the sum of $10,000 is punitive damages.

The case presents to this court for the first time the question whether there is such a thing in this state as a legal right of privacy, for breach of which an action for damages will lie. This right, first brought forcefully to the attention of the profession in the year 1890 by an article in the Harvard Law Review by Louis D. Brandeis (later Mr. Justice Brandeis) and Samuel D. Warren ("The Right to Privacy", 4 Harv. L. Rev. 193), is said to be one that inheres in an "inviolate personality". In the language of Judge Cooley: "The right to one's person may be said to be a right of complete immunity: To be let alone." Cooley on Torts, 4th Ed. 34, § 18.

Where this right has been invaded, as for example, by using the name or photograph of a person without

his authority, for advertising or commercial purposes, or by parading a person's intimate, private affairs before the public gaze, unjustifiably and against his will, some of the courts of this country have thought that no legal redress could be granted, largely because the right was unknown to the common law, and to recognize it would be judicial legislation. No one, however, has had the hardihood to excuse as ethically or morally defensible practices which, becoming increasingly common and in many instances more and more offensive and injurious, under modern social conditions and through the use of modern scientific inventions, give sharper point to the demand that in such cases courts discharge the function for which they exist, of administering justice and affording redress for wrongs committed.

The Court of Appeals of New York refused to recognize the existence of a legal right of privacy in the leading case of *Roberson v. Rochester Folding Box Co.*, *171 N. Y. 538, 64 N. E. 442, 59 L. R. A. 478, 89 Am. St. Rep. 828.* The plaintiff was a young woman whose picture had been appropriated for advertising purposes by a milling company. Twenty-five thousand likenesses of the plaintiff, printed as a part of an advertisement of the defendants' product, had been "conspicuously posted and displayed in stores, warehouses, saloons, and other public places". The court divided four to three on the question whether the complaint for an injunction and damages stated a cause of action. The opinion of the majority, written by Chief Judge Parker, while based primarily on the inability of the court to find authority or precedent for granting the relief sought, since, as it was said, no property right was involved, does not, as it seems to us, properly evaluate the enormity of the wrong done to the plain-

tiff. ''Such publicity'', it was said, ''which some find agreeable, is to plaintiff very distasteful, and thus, because of defendants' impertinence in using her picture, without her consent, for their own business purposes, she has been caused to suffer mental distress where others would have appreciated the compliment to their beauty implied in the selection of the picture for such purposes * * *''

But, to Judge Gray, who dissented with two of his associates, the proposition seemed ''an inconceivable one that these defendants may, unauthorizedly, use the likeness of this young woman upon their advertisement as a method of attracting widespread public attention to their wares, and that she must submit to the mortifying notoriety, without right to invoke the exercise of the preventive power of a court of equity.'' And, referring to decisions protecting a writer's or lecturer's right to a literary property in a letter or a lecture against its unauthorized publication, he said that he thought the plaintiff had the same property in the right to be protected against the use of her protraiture for the defendants' commercial purposes, and that: ''Any other principle of decision, in my opinion, is as repugnant to equity as it is shocking to reason.''

In the similar case of *Pavesich v. New England Life Ins. Co.*, 122 Ga. 190, 50 S. E. 68, 69 L. R. A. 101, 106 Am. St. Rep. 104, 2 Ann. Cas. 561, the court reached a conclusion contrary to that of the New York court. The opinion was written by Justice Cobb, who, with great ability, championed the right of privacy as a natural right, and any violation of that right a legal wrong which the common law was not powerless to redress. He said:

''The conclusion reached by us seems to be so thoroughly in accord with natural justice, with the prin-

ciples of the law of every civilized nation, and especially
with the elastic principles of the common law, and so
thoroughly in harmony with those principles as molded
under the influence of American institutions, that it
seems strange to us that not only four of the judges of
one of the most distinguished and learned courts of the
Union, but also lawyers of learning and ability, have
found an insurmountable stumbling block in the path
that leads to a recognition of the right which would give
to persons like the plaintiff in this case and the young
woman in the Roberson Case redress for the legal
wrong, or what is by some of the law writers called
the outrage, perpetrated by the unauthorized use of
their pictures for advertising purposes.''

And he concluded by venturing to predict ''that the
day will come that the American Bar will marvel that
a contrary view was ever entertained by judges of
eminence and ability, just as in the present day we stand
amazed that Lord Coke should have combatted with
all the force of his vigorous nature the proposition that
the court of chancery had jurisdiction to entertain an
application for injunction to restrain the enforcement
of a common-law judgment which had been obtained by
fraud, that Lord Hale, with perfect composure of man-
ner and complete satisfaction of soul, imposed the death
penalty for witchcraft upon ignorant and harmless
women.''

And while Judge Parker's observation that ''men-
tion of such a right is not to be found in Blackstone,
Kent, or any other of the great commentators upon the
law'', is true, there are modern commentators whose
judgment commands respect, who see a place for the
doctrine in the law of today. Dean Pound, writing in
1915, said upon this subject:

''It is a modern demand, growing out of the condi-
tions of life in the crowded communities of to-day, and

presents difficult problems. The interest is clear. Such publicity with respect to private matters of purely personal concern is an injury to personality. It impairs the mental peace and comfort of the individual and may produce suffering much more acute than that produced by a mere bodily injury. * * * But while the law is slow in recognizing this interest as something to be secured in and of itself, it would seem that the aggressions of a type of unscrupulous journalism, the invasions of privacy by reporters in competition for a 'story', the activities of photographers, and the temptation to advertisers to sacrifice private feelings to their individual gain call upon the law to do more in the attempt to secure this interest than merely take incidental account of infringements of it. A man's feelings are as much a part of his personality as his limbs. The actions that protect the latter from injury may well be made to protect the former by the ordinary process of legal growth. The problems are rather to devise suitable redress and to limit the right in view of other interests involved." ("Interests of Personality", 28 Harv. L. Rev. 362.)

Sir Frederick Pollock in "A First Book of Jurisprudence", p. 200, writes:

"There is much to be said for the suggestion recently made in America, and supported with great ability and ingenuity by its authors, that every citizen is entitled to a certain measure of privacy in his own affairs, as a branch of the general right to personal immunity; that this right, as applied to the communication of one's thoughts or sentiments to the public, is not limited to cases where the expression of them happens to be embodied in some tangible record such as a manuscript or drawing; and that it is independent of the right of property in any such tangible object. Of course there is no objection to the right of property, where it does happen to be available, being used in aid of the more general and personal right; and as this is the safer course when it is possible, a long time may

yet elapse before the fundamental question is decided by authority or by a consensus of reasoned opinion.''

Besides these, a host of scholars of lesser stature have welcomed the doctrine of the right of privacy as a valuable accretion to the law. See: 74 New York Law Review 433; Wisconsin Law Review 1938, p. 463; 17 Kentucky Law Journal 85; 12 Columbia Law Review 693; 5 Missouri Law Review 343; 27 Illinois Law Review 237; 39 Michigan Law Review 526; 15 Temple University Law Quarterly 148; 36 American Law Review pp. 614-620, 634-636.

Cases holding that there is no legal redress, in the absence of legislation, for violation of the right of privacy are *Judevine v. Benzies-Montayne Co.*, 222 Wis. 512, 269 N. W. 295, 106 A. L. R. 1443; *Henry v. Cherry & Webb*, 30 R. I. 13, 73 Atl. 97, 24 L. R. A. (N. S.) 991, 136 Am. St. Rep. 928, 18 Ann. Cas. 1006; *Hillman v. Star Publishing Co.*, 64 Wash. 691, 117 P. 594, 35 L. R. A. (N. S.) 595; *Atkinson v. John E. Doherty & Co.*, 121 Mich. 372, 80 N. W. 285, 46 L. R. A. 219, 80 Am. St. Rep. 507. *Vassar College v. Loose-Wiles Biscuit Co.*, 197 Fed. 932, cited by the defendant, was decided on other grounds, but the argument in the opinion tends strongly against recognition of the right. Two cases in Massachusetts were decided against the plaintiff on the ground that if there be any such right, which the court did not determine, it was not transgressed in the particular instances. *Themo v. New England Newspaper Publishing Co.*, 306 Mass. 54, 27 N. E. (2d) 753; *Thayer v. Worchester Post Co.*, 284 Mass. 160, 187 N. E. 292.

We will review briefly the decisions in which the courts have taken a contrary view. In *Flake v. Greensboro News Co.*, 212 N. C. 780, 195 S. E. 55, it was held to

be a tort to use the likeness of the plaintiff in connection with and as a part of an advertisement without the plaintiff's consent. The court approved the reasoning of the dissenting opinion of Judge Gray in the Roberson case and of Judge Cobb's opinion in the Pavesich case, but expressly limited the decision to the facts of the case before it, saying:

"So far as we have been able to ascertain, no court has yet held that it constitutes a tort for a newspaper to publish an image of an individual when such publication is not libelous, except when such publication involves the breach of a trust, the violation of a contract, or when the photograph is used in connection with some commercial enterprise, and we are presently called upon to decide only the right of an individual to prohibit the unauthorized use of an image of her features and figure in connection with and as a part of an advertisement."

In *Foster-Milburn Co. v. Chinn*, 134 Ky. 424, 120 S. W. 364, 366, 34 L. R. A. (N. S.) 1137, 135 Am. St. Rep. 417, the defendant, without authority published a picture of the plaintiff together with a purported recommendation by the plaintiff of kidney pills manufactured by the defendant. Citing the Pavesich case the court said:

"While there is some conflict in the authorities, we concur with those holding that a person is entitled to the right of privacy as to his picture, and that the publication of the picture of a person without his consent, as a part of an advertisement for the purpose of exploiting the publisher's business, is a violation of the right of privacy, and entitles him to recover without proof of special damages."

The Kentucky court in four decisions has sanctioned this doctrine. In *Rhodes v. Graham*, 238 Ky. 225, 37 S. W. (2d) 46, the wrongful act consisted of the tapping

by the defendants of the telephone wire running into appellant's home and listening to his private conversations. In *Brents v. Morgan*, 221 Ky. 765, 299 S. W. 967, 55 A. L. R. 964, the defendant caused a notice to be placed on a show window of his garage, fronting on one of the principal streets in the town in which the plaintiff and defendant lived, which notice was to the effect that the defendant owed the plaintiff an account which he had not paid, notwithstanding his promises. The court held that this constituted an unwarranted invasion of the plaintiff's right of privacy. In *Douglas v. Stokes*, 149 Ky. 506, 149 S. W. 849, 42 L. R. A. (N. S.) 386, Ann. Cas. 1914B, 374, the action was against a photographer who had been employed by the plaintiff to take a photograph of the corpses of the plaintiff's children, who had been born Siamese twins. The defendant made additional photographs from the negatives and had one of them copyrighted. The decision was upon two grounds: First, a violation of the implied agreement that the photographer would not make other copies of the picture, citing *Pollard v. Photographic Co.*, 49 Ch. Div. 345; and, second, a violation of the plaintiff's right of privacy, the court saying: "A man may recover for any injury or indignity done the body and it would be a reproach to the law if physical injuries might be recovered for and not those incorporeal injuries which would cause much greater suffering and humiliation."

In *Jones v. Herald Post Co.*, 230 Ky. 227, 18 S. W. (2d) 972, the defendant published in its newspaper a picture of the plaintiff in connection with an account of the tragic death of her husband. The court, while recognizing the right of privacy, held that it was not applicable in the circumstances of the case because

the plaintiff had become an actor in an occurrence of public or general interest. She had emerged from her seclusion. The court in the opinion quoted the following from 21 R. C. L. 1197:

"The right of privacy may be defined as the right to live one's life in seclusion, without being subjected to unwarranted and undesired publicity. In short, it is the right to be let alone."

In *Melvin v. Reid*, 112 Cal. App. 285, 297 P. 91, a cause of action was held to be stated in a complaint which charged the defendant with producing a moving picture of events in the unsavory past of the plaintiff. Eight years before the plaintiff, at that time a prostitute, had been the accused in a sensational murder trial, had since married, reformed and faded from the public view. The picture not only was based upon the record of the trial, but went further and used the plaintiff's true maiden name. The court held that the plaintiff should be, and was, protected from publicity of this sort by a provision of the California Constitution guaranteeing to every one "the right of pursuing and obtaining safety and happiness".

Following the doctrine announced by the California court in this case, United States District Judge St. Sure, of the District Court of the United States for the Northern District of California, sustained the right of privacy in *Mau v. Rio Grande Oil Co.*, 28 Fed. Supp. 845. The plaintiff in that case was held up by a robber and shot on March 22, 1937. On August 4, 1938, the defendant, the sponsor of a radio program, gave over the radio a dramatization of this occurrence, using the plaintiff's name. While basing his decision upon the case of *Melvin v. Reid*, as he was bound to do, Judge St. Sure indicated his approval of the doctrine, saying

with reference to the Harvard Law Review article by Justice Brandeis and Mr. Warren:

"This profound disquisition found its inspiration in the principle as old as the common law, giving to the individual full protection in person and in property. Development of the law was suggested along spiritual rather than material lines, with emphasis upon an inviolate personality. In actions founded upon the right of privacy, conservative jurists shied at an intangible spiritual concept as a basis for their conclusions, so they resorted to fictions!"

*Munden v. Harris*, 153 Mo. App. 652, 134 S. W. 1076, sustained a cause of action on behalf of a five-year-old child whose picture had been used without authority in connection with the jewelry advertisement. It was said in the course of the opinion:

"It may be admitted that the right of privacy is an intangible right but so are numerous others which no one would think of denying to be legal rights which would be protected by the courts. It is spoken of as a new right, when, in fact, it is an old right with a new name. Life, liberty and the pursuit of happiness are rights of all men. The right to live includes the pursuit of happiness, for it is well said that the right to life includes the right to enjoy life. Every one has the privilege of following that mode of life, if it will not interfere with others, which will bring to him the most contentment and happiness. He may adopt that of privacy, or, if he likes, of entire seclusion."

The Kansas court gave its approval to the right of privacy in *Kunz v. Allen*, 102 Kan. 883, 172 P. 532, L. R. A. 1918D, 1151, holding, on the authority of the Pavesich case and *Munden v. Harris*, that a woman had cause of action against the proprietors of a dry goods store who caused moving picture films to be taken of her and used in a theatre to advertise their business.

*Harlow v. Buno*, 26 Pa. D. & C. R. 101, is a similar decision. In *Smith v. Suratt*, 7 Alaska 416, the subject is discussed and the right recognized, though the facts were held not to show a violation.

The New Jersey courts, in two cases, have expressed disapproval of the New York Court of Appeals decision in *Roberson v. Folding Box Co.* In *Vanderbilt v. Mitchell*, 72 N. J. Eq. 910, 67 Atl. 97, 14 L. R. A. (N. S.) 304, it appeared that complainant's wife, having had born to her, two years after her marriage, a son who was not complainant's son, falsely stated to the attending physician that the complainant was the father of the child, and the physician inserted the statement in his birth certificate sent by him to the bureau of vital statistics where it was recorded. This record, under the statute, was *prima facie* evidence of the facts therein stated. The fraudulent record was cancelled, and an injunction granted restraining the mother and child from claiming thereunder the status, name or property of a child lawfully begotten by complainant. It was ruled that a property right was involved because the false statement exposed the complainant to the risk of pecuniary liability, and also because the complainant was the beneficiary of a vested remainder in land in New York, and under the laws of that state a man cannot devise more than half of his estate to charity where he leaves a child.

But, while placing its decision upon the technical basis that this property right was sufficient to sustain the jurisdiction, the Court of Errors and Appeals said:

"If it appeared in this case that only the complainant's status and personal rights were thus threatened or thus invaded by the action of the defendants and by the filing of the false certificate, we should hold, and

without hesitation, that an individual has rights, other than property rights, which he can enforce in a court of equity and which a court of equity will enforce against invasion. Pavesich v. New England Life Insurance Co., 122 Ga. 190, 50 S. E. 68, 69 L. R. A. 101, 106 Am. St. Rep. 104. And we should declare that the complainant was entitled to relief, and to a decree establishing the truth as to the paternity of the child, relieving the complainant of the intolerable burden prima facie put upon him by the false record and preventing the wife from perpetuating a fraud upon the husband, adopting the dissenting opinion of Gray, J., and rejecting the doctrine laid down by the majority in Roberson v. Rochester Folding Box Co., 171 N. Y. 538, 64 N. E. 442, 59 L. R. A. 478, 89 Am. St. Rep. 828, a case seldom cited but to be disapproved, the force of which was subsequently removed by statute. Laws N. Y. 1903, p. 309, c. 132.''

In *Edison v. Edison Polyform Mfg. Co.*, 73 N. J. Eq. 136, 67 Atl. 392, it appeared that the defendant came into possession of a formula for a medicinal preparation compounded by Thomas A. Edison, the inventor, and in advertising the preparation, without Edison's consent, published his picture on the labels on the bottles containing the preparation, together with the following words: ''Edison's Polyform. I certify that this preparation is compounded according to the formula devised and used by myself. Thomas A. Edison.'' Edison had never so certified, and the preparation lacked one of the drugs mentioned in Edison's formula. He sued to enjoin the use of his name and was granted a decree. The court held that Edison was not without standing to complain because he was not a business competitor. The opinion states that the Roberson case ''cannot be sustained on principle'', and:

''If a man's name be his own property, as no less an authority than the United States Supreme Court

says it is (Brown Chemical Co. v. Meyer, 139 U. S. 542, 11 Sup. Ct. 625, 35 L. Ed. 247) it is difficult to understand why the peculiar cast of one's features is not also one's property, and why its pecuniary value, if it has one, does not belong to its owner, rather than to the person seeking to make an unauthorized use of it. If the mere exhibition of one's face to one's friends and to others on the public streets be a publication for all purposes, then that line of cases of which Pollard v. Photographic Company is an example was wrongly decided, for there could be no implied contract or confidence to keep that private which was already public property.''

The court acknowledged that as far as its researches had gone injury to property in some form was an essential element of relief, but stated that ''the insignificance of the right from a pecuniary standpoint does not always bar relief'', and concluded, referring to the Vanderbilt case:

''The Court of Appeals has thus emphatically declared that the term 'property right' is not to be taken in any narrow sense, and that the tendency of equity in cases of this description should be to extend, rather than to restrict, the jurisdiction.''

Other cases, in some degree sustaining the doctrine of the right of privacy are: *Deon v. Kirby Lumber Co.,* 162 La. 671, 111 So. 55, 52 A. L. R. 1023; *Magouirk v. Western Union Telegraph Co.,* 79 Miss. 632, 31 So. 206, 89 Am. St. Rep. 663; *Waring v. WDAS Broadcasting Station, Inc.,* 327 Pa. 433, 194 Atl. 631; *Corliss v. Walker,* 57 Fed. 434, 64 Fed. 280, 31 L. R. A. 283; *Holloman v. Life Insurance Co. of Virginia,* 192 S. C. 454, 7 S. E. (2d) 169, 127 A. L. R. 110; *Schulman v. Whitaker,* 117 La. 704, 42 So. 227, 7 L. R. A. (N. S.) 274, 8 Ann. Cas. 1174; *McDaniel v. Atlantic Coca Cola Bottling Co.,* 60 Ga. App. 92, 2 S. E. (2d) 810, follows the decision in the Pavesich case.

The Washington court, which, as we have seen, has rejected the doctrine, nevertheless granted a writ of mandamus to restrain the unauthorized use by a political group of the name of Robert M. LaFollette, saying:

"Nothing so exclusively belongs to a man or is so personal and valuable to him as his name. His reputation and the character he has built up are inseparably connected with it. Others can have no right to use it without his express consent, and he has a right to go into any court at any time to enjoin or prohibit any unauthorized use of it. Nor is it necessary that it be alleged or proved that such unauthorized use will damage him. This the law will presume." *State v. Hinkle,* 131 Wash. 86, 93, 229 P. 317.

The American Law Institute declares:

"A person who unreasonably and seriously interferes with another's interest in not having his affairs known to others or his likeness exhibited to the public is liable to the other." 4 Restatement Torts 398, § 867.

The decision in the Roberson case was followed by the enactment of § 50 of the Civil Rights Law (New York Consolidated Laws), which provides that "a person, firm or corporation that uses for advertising purposes or for the purposes of trade the name, portrait or picture of any living person without having obtained the written consent of such person, or if a minor of his or her parent or guardian, is guilty of a misdemeanor." Later, in 1921, § 51 was added (*idem,* p. 6), authorizing suit to restrain such prohibited use and for the recovery of damages. It is not necessary here to review the decisions construing this statute. Many of them may be found digested in the article on "Right of Privacy" in 39 Mich. L. Rev. 526.

■■ There are precedents dealing with the right of privacy, but in another guise. The famous copyright case of *Millar v. Taylor*, 4 Burr, 2303, 2379 (K. B.) 1769, touches upon the subject. The writer of a private letter is protected against its unjustified publication; *Folsom v. Marsh*, 2 Story 100; *Gee v. Pritchard*, 2 Swanst 402; *Boosey v. Jefferys*, 6 W. H. & G. 580. In *Prince Albert v. Strange*, 1 Mac & G. 25, 41 Eng. Rep. 1171, 2 DeG. & Sm. 652, 64 Eng. Rep. 293 (1849), the defendant was enjoined not only from exhibiting copies of etchings which he had taken from plates unlawfully obtained, but also from selling descriptive catalogues of such etchings. It is a legal wrong for a photographer, employed to take a patron's picture, to make additional copies and use them for his own purposes without authorization. *Pollard v. Photographic Co.*, supra; *Lumiere v. Robertson-Cole Distributing Corp.*, 280 Fed. 550, 24 A. L. R. 1317, Anno. at p. 1320. The case of the photograph is put on the ground of breach of confidence or of implied condition of the contract; the others on a property in the letter or etchings. As to the letter, it is beside the mark whether it has great literary value or none at all.

Likewise, when the court was able to find that a right of property was involved, relief has been granted against the unauthorized use of one's name; though in some of the cases the property right was so slight as to be almost imperceptible. See, *Routh v. Webster*, 10 Beav. 561, 50 Eng. Rep. 698 (1847); *Walter v. Ashton* (1902), 2 Ch. Div. 282.

On the other hand, there are two cases in which the court refused relief to physicians whose names had been unauthorizedly used in advertising medicines sold by the defendants. *Dockrell v. Dougall*, 78 L. J. R. 840

(1898); *Clark v. Freeman*, 11 Beav. 112. Both decisions are put upon the ground of want of a property right, the physicians not being themselves vendors of rival medicines. Of the Clark case, where the name of the plaintiff, an eminent man in his profession, was attached to pills sold by the defendant as a cure for consumption, Lord Justice Cairns said: "It always appeared to me that Clark v. Freeman might have been decided in favor of the plaintiff, on the ground that he had a property in his own name". *Maxwell v. Hogg*, L. R. 2 Ch. 307, 310 (1866-7).

There is a good deal to be said for the view that in these cases invasion of privacy was the wrong, though breach of contract, of confidence or a property right was the peg upon which the decision was hung. Said Vice-Chancellor Bruce in Prince Albert's case (2 DeGex & Sm. 652, 696):

"I think, therefore, not only that the defendant here is unlawfully invading the plaintiff's rights, but also that the invasion is of such a kind and affects such property as to entitle the plaintiff to the preventive remedy of an injunction; and if not the more, yet, certainly, not the less, because it is an intrusion,—an unbecoming and unseemly intrusion, an intrusion not alone in breach of conventional rules, but offensive to that inbred sense of propriety natural to every man,— if intrusion, indeed, fitly describes a sordid spying into the privacy of domestic life,—into the home (a word hitherto sacred among us), the home of a family whose life and conduct form an acknowledged title, though not their only unquestionable title, to the most marked respect in this country."

Again in the Pollard case, North, J., observed:

"The phrase 'a gross breach of faith' used by Lord Justice Lindley in that case (Tuck v. Priester, 19 Q. B. D. 629) applies with equal force to the present, when

a lady's feelings are shocked by finding that the photographer she has employed to take her likeness for her own use is publicly exhibiting and selling copies thereof." (40 Ch. Div. 352—1889).

In the Pollard case, counsel for the plaintiff conceded that "if a negative likeness were taken on the sly the person who took it might exhibit or sell copies" on the ground that there would be no contract or consideration to support a contract. That was a logical concession if breach of contract or confidence was necessarily the foundation of the action. But how are we to justify granting the protection of the law to one whose feelings are shocked by the public exhibition of a photograph which one has authorized to be taken, and withholding it from the unwilling victim of modern instantaneous photography? Both cases are concerned primarily with an indignity offered to the plaintiff's personality, and the only difference is that in the one a fiction is available which is wanting to the other. The wrong in each instance is identical. Use of the fiction enabled the court to give legal and judicial respectability to the right of privacy by calling it by another name. Such fictions, as the history of common law demonstrates, afford the means to the establishment of rights long seeking recognition, but to which the want of a precedent has seemed to interpose an insuperable barrier. See, Pound, "Spirit of the Common Law", p. 166, Ch. VII.

■ As to names, it is the general rule (although, as we have observed, there is authority to the contrary) that a person has no such exclusive right to the use of his own name as to prevent the assumption of its use by another. But it is different when one's own name is used in such a way as to amount to unfair com-

petition. In connection with questions of that kind, a man's name is said to be his own property. 45 C. J. Names, 382, § 18; 26 R. C. L. Trade-Marks, 854, § 33; *Wood v. Wood*, 78 Or. 181, 151 P. 969, L. R. A. 1916 C, 251, Ann. Cas. 1918 A, 226; *Brown Chemical Co. v. Meyer*, 139 U. S. 540, 35 L. ed. 247, 11 S. Ct. 625; Hopkins on Trade-Marks (3d Ed.) 175, § 77; *Vassar College v. Loose-Wiles Biscuit Co.*, 197 Fed. 982, 987.

By analogy to this principle, there ought to be little difficulty today in deciding a question such as that involved in the Roberson case in favor of the one asserting the exclusive right to the use of his own picture as against appropriation by another for the purpose of advertising his wares; for selling one's likeness to be so used is today a business in itself. Faces—some faces, at any rate—have a recognized commercial value. The face of the plaintiff in the Roberson case must have had such value, else the defendants would not have gone to the trouble and expense of reproducing and distributing broadcast her likeness. If it was of value to the defendants, why not to her, even though she preferred not to capitalize upon it? Said Judge Gray in his dissenting opinion in the Roberson case:

"Property is not necessarily the thing itself which is owned; it is the right of the owner in relation to it. The right to be protected in one's possession of a thing, or in one's privileges, belonging to him as an individual, or secured to him as a member of the commonwealth, is property, and as such entitled to the protection of the law."

■ But we deem it unnecessary to search for a right of property, or a contract, or a relation of confidence. The question is whether a right of privacy, distinct and of itself and not incidental to some other long rec-

ognized right, is to be accepted by the courts and a violation of the right held actionable. We are called upon, as Mr. Justice Holmes says somewhere, "to exercise the sovereign prerogative of choice" between the view that the courts for want of a precedent are impotent to grant redress for injury resulting from conduct which universal opinion in a state of civilized society would unhesitatingly condemn as indecent and outrageous, and the view that the common law, with its capacity for growth and expansion and its adaptability to the needs and requirements of changing conditions, contains within itself the resources of principle upon which relief in such a case can be founded. As the court said in *Clark v. Associated Retail Credit Men*, 105 Fed. (2d) 62: "We cannot evade this duty, for unless we establish a right in the plaintiff we establish a privilege or immunity in the defendant."

Our consideration of the subject leads us to the conclusion that natural justice and the needs of the society in which we live should prevail over objections based upon the novelty of the asserted cause of action. It is time that fictions be abandoned and the real character of the injury be frankly avowed. When Brandeis' and Warren wrote in 1890, it was the unseemly intrusions of a portion of the press into the privacy of the home that was emphasized as the main source of evil; since then motion pictures and the radio have been perfected and have taken their places among our great industries, while instantaneous photography today accomplishes miracles scarcely dreamed of fifty years ago. Thus, the potentialities for this character of wrong are now greatly multiplied. A decision against the right of privacy would be nothing less than an invitation to those so inclined who control these instru-

mentalities of communication, information and education, to put them to base uses, with complete immunity, and without regard to the hurt done to the sensibilities of individuals whose private affairs might be exploited, whether out of malice or for selfish purposes.

We should not be deterred by fear of being accused of judicial legislation. Much of our law is judge-made, and there are those who think that it is the best law. Cardozo, "The Growth of the Law", p. 133. The common law's capacity to discover and apply remedies for acknowledged wrongs without waiting on legislation is one of its cardinal virtues. The so-called "family purpose doctrine", approved by this court in *McDowell v. Hurner*, 142 Or. 611, 13 P. (2d) 600, 20 P. (2d) 395, 88 A. L. R. 578, is a creation of the courts, and so, as Mr. Justice BAILEY points out in the opinion in that case, are the defenses of fellow-servant, assumption of risk and contributory negligence. Courts cannot, of course, as Sir Frederick Pollock says in "The Expansion of the Common Law", p. 49, "lay down any rule they choose". He continues, however: "They may supplement and enlarge the law as they find it, or rather they must do so from time to time, as the novelty of questions coming before them may require; but they must not reverse what has been settled."

The opinion of the court in the Roberson case, after an exaggerated statement, as we view it, of what is claimed for the right of privacy, dwelt upon the absurd consequences which it was conceived would follow from acceptance of the doctrine. "The attempt to logically apply the principle", it was said, "will necessarily result not only in a vast amount of litigation but in litigation bordering on the absurd." It was not stated that the litigation then before the court was absurd.

It may be doubted whether any court today would render the decision that the New York court did in that case, and there is reason to believe that the accuracy of Justice Cobb's prediction, above quoted, as to the attitude of the American Bar toward that decision may already have been demonstrated. Be that as it may, all judicial decisions, as Mr. Justice Holmes once said, "are a series of points tending to fix a point in a line." 2 Holmes—Pollock Letters, 28. When a legal principle is pushed to an absurdity, the principle is not abandoned, but the absurdity avoided. The courts are competent, we think, to deal with difficulties of the sort suggested, and case by case, through the traditional process of inclusion and exclusion, gradually to develop the fullness of the principle and its limitations. That there are difficulties may be conceded. They arise especially in that class of cases where the complaint is founded on unwanted publicity and are well illustrated by the recent case of *Sidis v. F-R Publishing Corp.*, 113 Fed. (2d) 806 (CCA 2), where the action was brought by a quondam infant prodigy, once much in the public eye, who had sought out for himself a life of obscurity from which he was rudely lifted by a magazine article. He sued the publishers of the magazine. The court held, rightly as we think, that, since the plaintiff's subsequent history "was still a matter of public concern" and the article possessed "considerable popular news interest", the plaintiff's right of privacy had not been invaded. In such cases, other interests, such, for example, as the freedom of the press, are involved, and the courts must needs proceed cautiously. We are not embarrassed by questions of that kind here, and can defer their discussion until they arise.

 The objection is urged that the law does not give redress for mental anguish alone, and that no other damage is alleged in the complaint in the instant case. The rule invoked is the law in this state. *Adams v. Brosius*, 69 Or. 513, 139 P. 729, 51 L. R. A. (N. S.) 36; *Rostad v. Portland Ry. L. & P. Co.*, 101 Or. 569, 581, 201 P. 184. But it is well settled that where the wrongful act constitutes an infringement of a legal right, mental suffering may be recovered for, if it is the direct, proximate and natural result of the wrongful act: *Larson v. Chase*, 47 Minn. 307, 310, 50 N. W. 238, 28 Am. St. Rep. 370, 14 L. R. A. 85; 17 C. J. Damages, 828, § 151. Violation of the right of privacy is a wrong of that character.

 The damages may be difficult of ascertainment, but not more so than in actions for malicious prosecutions, breach of promise of marriage, or alienation of affections, and in many cases of libel, slander and assault. The law has never denied recovery to one entitled to damages simply because of uncertainty as to the extent of his injury and the amount which would properly compensate him.

 It remains only to say that the complaint plainly states a cause of action for breach of the plaintiff's right of privacy. If the facts are as alleged, the defendants appropriated to themselves for their own purposes, without the plaintiff's consent and against his will, his name, his personality and whatever influence he may have possessed, and injected them into a political controversy in which, as far as appears, he had no interest. This they had no legal right to do, and on account of their wrong the plaintiff is entitled to recover nominal damages at least, and any additional damages for injury to his feelings that he may be able

to prove, besides punitive damages if there was actual malice. He is not entitled to damages, however, on the theory that the defendants' acts endangered his position or his retirement rights as an employe of the government, since, although it possibly would have been a violation of the United States Civil Service Rules for the plaintiff to have sent the telegram himself, he did not in fact do so, and it cannot be assumed that he would have been penalized for misconduct of which he was not guilty.

■ It is, perhaps, needless to add that, the case being here on demurrer, our decision is necessarily based upon the assumption that the allegations of the complaint are true. What defense there may be to the charge remains to be seen.

The judgment is reversed, and the cause is remanded with directions to overrule the demurrer to the complaint, and for further proceedings.