Joanne ROGERS, Plaintiff,

v.

HEXOL, INC., a California corporation, Defendant.

Civ. No. 62–205.

United States District Court
D. Oregon.

Nov. 2, 1962.

L. M. Giovanini, Portland, Or., for plaintiff.

Hollister & Thomas, William F. Thomas, Portland, Or., for defendant.

EAST, District Judge.

Plaintiff's complaint is in notice and demand form, but her apparent claim assumes a form of narrative life through

her discovery deposition taken by the defendant.

It seems that the defendant manufactures and sells to dealers through interstate commerce for resale to the public a liquid disinfectant and cosmetic product under the trade name of "Hexol" and that Hexol contains a derivative of pine oil. Plaintiff asserts that this derivative is toxic and a poisonous and deleterious substance and that the bottle of Hexol she had purchased from a Eugene, Oregon, retailer and maintained in her home was not labeled as required by the provisions of the Federal Food, Drug and Cosmetic Act, Title 21 U.S.C.A. § 301 et seq., and ORS 453.210.

Plaintiff related:

That as of September 22, 1961, she resided with her husband of some 11 years and two sons, Michael, age 4, and Ronnah, age 6, in the Portland, Oregon area. That for some six years previous she had been, upon advice from her physician, an occasional purchaser and user of the product Hexol for personal hygiene purposes, and had on hand the bottle of Hexol which "was put in the (under-the-sink) bathroom cabinet" at her home. Plaintiff had just returned home from shopping and had given Michael some toilet tissue to take to the bathroom.

"I heard the water running in there and this hacking and this spitting, so I went in and got him out, and the minute I smelled his breath, I knew what he had gotten into his mouth from the odor * * * and —I said to my aunt, 'he has been in the Hexol.' * * * I got it out and read the label, the contents, and there was nothing on there to tell me that it was poisonous. So I came back out and I said to my aunt, 'I guess if it is anything, if it makes him sick, he will throw up.' We talked about it for a while, and I guess about twenty minutes or thirty minutes later, she suggested in order to put my mind at ease, I had best call my doctor.

"I called the office * * * I got his wife * * * She said she would check with the doctor and have him check with the poison book and call me.

"Q. During this some twenty-five minutes or a half hour, from the time he drank it until you got the telephone call, was Michael showing some ill effects from having drunk this?

"A. No. He told me his mouth was burning and he kept wanting to wash it out with water, which is what we were doing. He was rinsing out his mouth.

"Probably only a few minutes * * * went by, and the telephone rang and he told me * * * 'Now, don't rush because we don't want to have an accident, but I will call the hospital and they will have everything prepared, and you are to take Michael immediately to the emergency service of St. Vincent Hospital.' * * * and this is when I went all to pieces, of course.

"Q. Did you fall or something?

"A. As I was leaving the stool, I lost my balance. I had become so excited at this point, up to this point thinking there was nothing wrong, just simply checking, and from what he told me, I knew there was something to be concerned about. I just simply plopped off of the stool. * * *

"In a nutshell, what are you complaining about?

"The anguish and the injuries that they caused me.

"What anguish and what injuries?

"The mental worry, the upset, the injuriousness to me through this.

"Well, I hit my head, but then I got a bump, but—the doctor was talking to me on the telephone and I became so excited out of this, realizing suddenly what had happened—I was sitting on a stool at the counter

and I (fell off the stool) and hit my head on the edge of the counter * * * a bump on the head, I am not in the habit of running to the doctor."

"What would be your best recollection as to how long the bump lasted?

"A. I don't know. A goose egg —a week, ten days.

"Q. Was the skin cut in any way?

"A. No."

Defendant has moved for summary judgment. My task is not to ascertain whether plaintiff *has* stated a cause of action, but rather *can* she, under the foregoing factual picture when viewed in its most favorable light.

We assume that Hexol contains a poisonous substance and that the defendant was negligent as a matter of law in failing to label the bottle as required by the federal and Oregon enactments. Further, "but for" the lack of labeling, plaintiff left the bottle of Hexol within the range of the to-be-expected reach and drinking proclivities of young Michael.

It is axiomatic that excitement, worry and emotional distress on the part of a normal mother would follow the knowledge that her young son had drunk a disinfectant solution. Such anguish would vary in rising degrees of intensity from the stoic to the excitable range of normal mothers. Furthermore, it is just as axiomatic that such mental anguish would be greatly intensified upon the advice by the doctor that the young son should be hospitalized for immediate emetic treatment.

"The extent and duration of emotional distress produced by the tortious conduct depend upon the sensitiveness of the injured person." Excerpt, Restatement of Law of Torts, cited in Fehely v. Senders, 170 Or. 457, 475, 135 P.2d 283, 145 A.L.R. 1092.

I have a compelling conviction that the foregoing picture of emotional anguish resulting in personal injury on the part of a mother would be a reasonably foreseeable result to any reasonably prudent manufacturing and dispensing pharmacist who failed to label a poisonous substance as required by law.

"Foreseeability does not mean that the precise hazard or the exact consequences which were encountered should have been foreseen. Upon this all are agreed, whether they regard *foreseeability as relevant only to the duty issue,* or to questions of *proximate cause as well.* '[W]hen it is found that a man ought to have foreseen in a general way consequences of a certain kind, it will not avail him to say that he could not foresee the precise course or the full extent of the consequences, being of that kind, which in fact happened.' " Law of Torts, Harper & James, Vol. 2, p. 1147.

" ' "Liability for negligence is not predicated upon the necessity that the wrongdoer should foresee that an injury would result from his wrongdoing. It is sufficient that in view of all the circumstances, he should have foreseen that his negligence would probably result in injury of some kind to some one." Horne v. Southern Railway Company, 186 S.C. 525, 197 S.E. 31, 36, 116 A.L.R. 745.' " Lane v. Stewart, 221 Or. 293, 302–303, 351 P.2d 73–78.

"If the negligent actor is liable for another's injury, he is also liable for any additional bodily harm resulting from acts done by (physicians) in rendering aid which the other's injury reasonably requires, irrespective of whether such acts are done in a proper or negligent manner." Restatement of Law of Torts, Vol. 2, § 457. Also, Law of Torts, Harper & James, Vol. 2, § 20.3, p. 1124 n. 13.

The question now is, is the defendant legally liable for plaintiff's foreseeable emotional distress and resulting minor physical injury flowing from the knowledge that her young son had been injured by the tortious act (failure to label) of

defendant? A most recent authority holding for such liability is Amaya v. Home Ice, Fuel & Supply Co., 23 Cal. Rptr. 131 (D.C.App. 1st Dist. July 3, 1962). In Amaya, the court very ably analyzes the existing American and English case law and writings of legal scholars on the subject, and allowed that the generally more liberal and magnanimous rule prevailing in England was too "compelling authority." This case is entitled to "a must" perusal by all who have occasion to deal with this question.

■ It does not appear that the Supreme Court of Oregon has had this precise question of liability before it. Therefore, my function is to prognosticate the holding of that court if it were to deal with the exact question today, even tomorrow. As "[f]ederal courts in diversity cases are ' "called upon to determine as best we may what the highest court of (Oregon) would hold if confronted with the controversy now presented to us." ' " Ward v. Union Bond & Trust Co., 243 F.2d 476, 481, n. 8. As Circuit Judge Barnes puts it, "[o]ur task is not to innovate, but to imitate." [1]

Nineteen years ago, in a landmark decision by Justice Lusk, the Oregon court broke away from prior decisions and allowed recovery for emotional anguish on the part of a pregnant woman for the safety and well-being of her unborn child as an element of damage incidental to her personal injury. Fehely, supra. There the court reiterated that:

"It is established by the decisions of this court that one *suffering* from *injuries to his person* [italics supplied] due to the negligence of another may recover for mental distress and anguish which directly and as a natural consequence flows from the physical injury whether present or fairly and reasonably to be apprehended. [Citations omitted.] * * * "

then remarked

"This is the general rule (15 Am. Jur., Damages, 592, § 175; 1 Sedgwick on Damages, 9th Ed., 62, 43i); but there is a marked difference in judicial attitude toward the question of what character of mental suffering is to be regarded as the natural result of *a physical injury*." [Italics supplied.] p. 461 of 170 Or. p. 285 of 135 P.2d

and in part concluded

"Finally, the American Law Institute has thrown the weight of its authority on the side of the broader doctrine, as appears from the following quotations from Vol. 4, Restatement of the Law of Torts: * * *

"At page 545 the following illustration is given: * * *

" 'As an element of damages for a tort, a person may be entitled to recover for a feeling of anxiety, not only for himself but for others, if this is the expectable result of the defendant's tortious act or if the defendant intended such result.' Page 545.

" ' * * * there is no rule of certainty with reference to the amount of recovery permitted for any particular type of emotional distress; the only limit is such an amount as a reasonable person could possibly estimate as fair compensation. Thus damages can be recovered * * * for the sorrow which a prospective mother would feel over the failure to have her child born

[1] " * * * Where the course of the law remains uncharted, * * * it is the duty of the Federal court to examine * * * analogous decisions in (the District's state) and to endeavor to ascertain from those decisions how the (highest court of the state) would decide the case at bar. In the absence of direct authority, we must heed such guideposts as the state courts have constructed, * * * ." Young v. Aeroil Products Co., 248 F.2d 185, 188 (9th Cir. 1957).
Caveat: "[I]t would be a bold prophet indeed who could predict with certainty (or better with accuracy) the present and future law in the field of * * * negligence." Malfitano v. King Line, Ltd., (S.D.N.Y.1961), D.C., 198 F.Supp. 399, 1961 A.M.C. 1855.

alive.' " pp. 469–470 of 170 Or. p. 288 of 135 P.2d.

and declared

" \* \* \* apprehension of a pregnant woman, injured in her person by the negligence of another, that harm may result from the injury to her unborn child, is such mental anguish as may be properly taken into account in estimating her damages; \* \* \*." p. 474 of 170 Or. at p. 290 of 135 P.2d.

even though

" \* \* \* her fears proved to be unfounded, and she gave birth to a normal child." p. 475 of 170 Or. p. 290 of 135 P.2d.

Two years before Fehely, Justice Lusk, speaking for the Oregon court in another landmark case, Hinish v. Meier & Frank Co., 166 Or. 482, 113 P.2d 438, 138 A.L.R. 1, held that the unauthorized use of plaintiff's name by the defendant, to its apparent financial interest, was a violation of plaintiff's right of privacy, a recognizable right, "distinct and of itself and not incidental to some other long recognized right." This case renounced old thoughts and tenets of policy and adopted for Oregon the rule [2] that a personal right of privacy was recognizable as such

and a violation thereof was actionable. And further that "mental suffering," the sole alleged damage, was compensable as a recoverable item of damage, being a direct and natural result of the *infringement of a (right of privacy)*. [Italics supplied.] p. 506, of 166 Or., p. 448 of 113 P.2d.

In Mills v. Liquidators, 206 Or. 212, 288 P.2d 1060, plaintiff was the victim of a wrongful attachment of her property at the instance of the defendant. Justice Perry for the Oregon court, dealt with the defendant's contention that the total claim of damages as set out by the plaintiff was based upon an emotional disturbance for which damages are not allowable in this state, citing Fehely. The court said that the "contention relating to damage is likewise untenable." The complaint states clearly that there was an interference with the property of the plaintiff.

"An action for wrongful attachment is in the nature of an action of trespass for conversion of personal property;"

I have concluded that the Oregon court would agree with Amaya that logical extension of the rationale of the test of reasonable foreseeability should pierce the veil of the "zone of risk" [3] and establish

2. "We are called upon, as Mr. Justice Holmes says somewhere, 'to exercise the sovereign prerogative of choice' between the view that the courts for want of a precedent are impotent to grant redress for injury resulting from conduct which universal opinion in a state of civilized society would unhesitatingly condemn as indecent and outrageous, and the view that the common law, with its capacity for growth and expansion and its adaptability to the needs and requirements of changing conditions, contains within itself the resources of principle upon which relief in such a case can be founded. As the court said in Clark v. Associated Retail Credit Men, 70 U.S.App.D.C. 183, 105 F.2d 62, 64: 'We cannot evade this duty; for unless we establish a right in the plaintiff we establish a privilege or immunity in the defendant.'
"Our consideration of the subject leads us to the conclusion that natural justice and the needs of the society in which we live should prevail over objections based

upon the novelty of the asserted cause of action. It is time that fictions be abandoned and the real character of the injury be frankly avowed." Hinish, supra, at p. 503 of 166 Or. at p. 446 of 113 P. 2d 446.

3. "Under general principles recovery should be had in such a case if defendant should foresee fright or shock severe enough to cause substantial injury in a person normally constituted. Plaintiff would then be within the zone of risk in very much the same way as are plaintiffs to whom danger is extended by acts of third persons, or forces of nature, or their own responses (where these things are foreseeable.)" Law of Torts, Harper and James, Vol. 2, p. 1036 § 18.4 (citations, n. 26). A long-sleeping Scottish giant has recently been aroused to guide our present day courts: Henningsen v. Bloomfield Motors, 32 N.J. 358, 161 A.2d 69, 75 A.L.R.2d 1 (Sup.Ct.N.J.1960); Middleton, Admx., v. United Aircraft Corp., D.C., 204 F.

a legal duty to ward against, as well as legal cause for plaintiff's plight. But that does not say the Oregon court would recognize within the bundle of human rights a hidden or sleeping "right,[4] distinct in and of itself and not incidental to some other long-recognized right"—a right to a tranquil and peaceful mind free from emotional distress such as worry, fear or grief, resulting in one's physical illness or injury over another injured or killed person, kith and kin— a violation of which itself is actionable.

" * * * a type of harm which the courts have been reluctant to recognize." Amaya, p. 134 of 23 Cal. Rptr.[5]

■■ I am content to predict that the Oregon court would reject recovery; not, as stated, because such emotional distress on the part of the plaintiff was not foreseeable by the defendant, "but," in the words of Justice Tobriner (Amaya) "rather that the courts must deny recovery for reasons of policy * * *," which to me means a jurisprudential delineation of nonactionable infringements in Oregon today, even tomorrow. Recovery can be had for one's emotional distress incidental to and directly resulting from a violation of one's own right to be free from personal hurt (Fehely), and rights of privacy (Hinish), or property (Mills), and probably fear for one's safety,[6] but not as an incident to and a result of a violation of these same rights of a third person.

Knowing of the Oregon court's esteem for the Restatement, the following advice as to the position of the Council of the American Law Institute is too "compelling authority" for me:

" * * * The underlying problem has given the draftsmen of the Restatement of the Law of Torts 2d considerable trouble. Thus the original Restatement provision, § 313, Restatement of the Law of Torts

Supp. 856, 1962 A.M.C. 1789 (S.D.N.Y. 1960) in finding good reason and logic to pierce the veil of privity in the realm of products liability on actionable negligence —MacPherson v. Buick Motor Co., 217 N. Y. 382, 111 N.E. 1050 (N.Y.Ct.App. 1916), p. 1053:

"We are dealing now with the liability of the manufacturer of the finished product, who puts it on the market to be used without inspection by his customers. If he is negligent, *where danger is to be foreseen* [italics supplied], a liability will follow.
* * * * *
"We have put aside the notion that the duty to safeguard life and limb, *when the consequences* of negligence *may be foreseen*, grows out of contract and nothing else. We have put the source of the obligation where it ought to be. We have put its source in the law." [Italics supplied.]

4. " 'It may be admitted that the right of privacy is an intangible right; but so are numerous others which no one would think of denying to be legal rights, which would be protected by the courts. It is spoken of as a new right, when, in fact, it is an old right with a new name. Life, liberty, and the pursuit of happiness are rights of all men. The right to life includes the pursuit of happiness; for it is well said that the right to life includes the right to enjoy life. Every one has the

privilege of following that mode of life, if it will not interfere with others, which will bring to him the most contentment and happiness. He may adopt that of privacy, or, if he likes, of entire seclusion.' " Hinish, at p. 494 of 166 Or. at p. 443 of 113 P.2d.

5. "The general reluctance to grant relief for emotional distress is demonstrated in cases cited in Prosser, Law of Torts (2d Ed. 1955) p. 38; Magruder, Mental Disturbance in Torts, 49 Harv.L.Rev., pp. 1033, 1035; N.Y.Law Rev.Comm.Report (1936), Recommendation of the Law Revision Commission to the Legislature, Relating to Liability for Injuries Resulting from Fright or Shock, pp. 379, 410–422." Amaya, n. 2, p. 134 of 23 Cal.Rptr.

6. "Several (courts) have required that emotional disturbance be fear for oneself * * *" Law of Torts, Harper and James, p. 1037, n. 31.
Also:
" 'The principle here decided is that when physical injury flows directly from extreme fright or shock, caused by the ordinary negligence of one who owes the duty of care to the injured person, such fright or shock is a link in the chain of proximate causation as efficient as physical impact from which like results flow.' " Salmi v. Columbia & N. R. R. Co., 75 Or. 200, at p. 205, 146 P. 819, at p. 821, L.R.A.1915D, 834.

(1934) provides as follows: 'If the actor unintentionally causes emotional distress to another, he is liable to the other for illness or bodily harm of which the distress is a legal cause if the actor (a) should have realized that his conduct involved an unreasonable risk of causing the distress, otherwise than by knowledge of the harm or peril of a third person, and (b) from facts known to him should have realized that the distress, if it were caused, might result in illness or bodily harm. Caveat: The Institute expresses no opinion as to whether an actor whose conduct is negligent as involving an unreasonable risk of causing bodily harm to a child or spouse is liable for an illness or other bodily harm caused to the parent or spouse who witnesses the peril or harm of the child or spouse and thereby suffers anxiety or shock which is the legal cause of the parent's or spouse's illness or other bodily harm.' (Pp. 850–851.) In Tentative Draft No. 5, the Reporter, Professor Prosser, proposes deleting the caveat and substituting: '(2) The rule stated in subsection (1) has no application to illness or bodily harm of another, caused by emotional distress arising solely from harm or peril to a third person, unless the negligence of the actor has otherwise created an unreasonable risk of bodily harm to the other.' (P. 9.) The import of this change is altered, however, upon reading the reasons advanced by the Reporter: 'Note to Institute: The Caveat is stricken, and Subsection (2) is substituted, because of the overwhelming weight of the case law. The Advisers are unanimous in wishing to retain the Caveat, for its possible effect upon the courts—although it must be conceded that it has thus far had no effect. The Reporter is in sympathy with this position, and feels that there should be liability to a mother who suffers a heart attack when she sees her child killed before her eyes. He is compelled, however, to recognize that the decisions are otherwise. The Council are agreed that the Caveat should go out, and the definite rule of nonliability should be stated.' (p. 9.)" Amaya, pp. 136–137, n. 6 of 23 Cal. Rptr.

I conclude that the defendant's motion for summary judgment in its favor should be granted.

Counsel for the defendant is requested to submit proposed form of judgment following service upon counsel for the plaintiff.