**SOUTHWESTERN BELL TELEPHONE COMPANY, Appellant,**

v.

**James H. ASHLEY et ux., Appellees.**

**No. 5105.**

Court of Civil Appeals of Texas, Eastland.

Feb. 16, 1978.

Rehearing Denied March 9, 1978.

Hubert W. Green, Jack Hebdon, James E.
Barden, San Antonio, Wayne E. Babler, St.

Louis, Mo., Dewey, Ballantine, Bushby, Palmer & Wood, New York City, for appellant.

Pat Maloney, San Antonio, for appellees.

WALTER, Justice.

James H. Ashley and wife, Bonnie Ashley, filed suit against Southwestern Bell Telephone Company, Chester L. Todd, David E. Burchett, and Joe Cochran alleging the defendants entered into a conspiracy to invade their privacy, wrongfully invaded their privacy by the unlawful use of their long distance records, and were guilty of wiretapping and eavesdropping. The court directed a verdict in favor of all the individual defendants on all claims. The court instructed a verdict for Bell on the conspiracy and the unlawful use of plaintiffs' long distance records and overruled its motion for an instructed verdict on the wiretapping and eavesdropping count.

The Ashleys recovered a $1,000,000 judgment against Bell for actual and exemplary damages based on their alleged cause of action for wiretapping and eavesdropping. Bell has appealed.

Special Issue No. 1 and the jury's answer thereto are as follows:

"SPECIAL ISSUE NO. ONE

After November 15, 1974, did Southwestern Bell Telephone Company, acting by its agents, servants and employees, engage in the furtherance of its business, by wire tapping and/or eavesdropping, intercept telephone conversations between Plaintiffs, James H. Ashley and Bonnie Ashley, and other persons?

Answer 'Yes' or 'No'.

We, the Jury, answer: Yes "

In *Billings v. Atkinson*, 489 S.W.2d 858 (Tex.1973), the court said:

"Measured by these considerations, we follow the rule that an unwarranted invasion of the right of privacy constitutes a legal injury for which a remedy will be granted.

In an alternative holding, the court of civil appeals denied petitioner's recovery of damages for mental suffering in the absence of resulting physical injury, citing *Harned v. E-Z Finance Co.*, 151 Tex. 641, 254 S.W.2d 81, and *Fisher v. Carrousel Motor Motel, Inc.*, 424 S.W.2d 627 (Tex. 1967). These cases do not support the court of civil appeals holding in view of our present holding that the invasion of privacy is a willful tort which constitutes a legal injury. Damages for mental suffering are recoverable without the necessity of showing actual physical injury in a case of willful invasion of the right of privacy because the injury is essentially mental and subjective, not actual harm done to the plaintiff's body. *Olan Mills, Inc. of Texas v. Dodd*, 234 Ark. 495, 353 S.W.2d 22 (1962); *Hinish v. Meier & Frank Co.*, 166 Or. 482, 113 P.2d 438; *Fairfield v. American Photocopy Equipment Co.*, 138 Cal.App.2d 82, 291 P.2d 194; Prosser, Torts 4th Ed., Right of Privacy, § 117. The right of privacy is a right distinctive in itself and not incidental to some other recognized right for breach of which an action for damages will lie. A violation of the right is a tort.

Petitioner next contends the trial court erroneously disregarded certain jury findings because such findings were supported by the evidence. The trial court granted the judgment non obstante veredicto, not because the jury findings were not supported by the evidence, but because petitioner's cause of action was for invasion of privacy, that wire tapping is an invasion of privacy and no cause of action can be maintained in the courts of this State for an invasion of privacy. As noted, we are of the view this was erroneous."

The telephone company contends the court erred in rendering judgment for the Ashleys because there is no evidence to support the jury's answer to Special Issue No. One.

Appellees say:

"The Appellant makes much of the fact that pictures of an employee climbing the pole were not obtained by the Appellees and, therefore, such claim against them as to invasion of privacy is meaningless.

It is untrue that the matter was proven by Appellees only circumstantially, but, to the contrary, much 'hard evidence' was obtained through the comments and testimony of executives holding sensitive managerial positions involving security operations, including Mr. Louis Bailey, superior to T. O. Gravitt, Deceased; Mr. T. O. Gravitt, head of Texas, Mr. Ashley's closest friend; Mr. Sommer, division manager of Waco; Mr. Hohman, division manager of Austin; Mr. Brookmole, division manager of Midland; Mr. Robinson; and Mr. Mason, executives in Dallas, Texas; all with strong evidence and testimony that Bell was wiretapping."

The Ashleys sought recovery in this case for wiretapping and eavesdropping after November 15, 1974. James H. Ashley was an employee of Southwestern Bell for about twenty-five years. He was general commercial manager in San Antonio at the time of his dismissal in 1974. He testified he had listened to thousands of conversations at the direction of "Mother Bell"; he professed to be as expert in the field of interception of oral communication as anyone he knew; and, he considered himself to be an expert with reference to the functioning of the telephone company. He was asked:

"Q After living in that house for over a year in which you contend you were wiretapped day after day, you don't have a single photograph, you don't have a note, you don't have a scratch of the pencil, you don't have anything to evidence those claims and contentions, do you?"

He answered:

"A I don't have anything but the certain knowledge that I was wiretapped."

James H. Ashley testified substantially as follows:

T. O. Gravitt was a well-known company official, but I did not meet him until December, 1964. I consider him to be the most outstanding executive I ever met in the Bell system. At the time of his death, he was vice-president of Texas and held that position a little over a year prior to his death. I was a close confidant of Mr. Gravitt. Mr. Gravitt and I discussed intimate matters about the operation of the company. He and I discussed the matter of wiretapping within the Bell system during the weeks prior to his death. He told me Bell was wiretapping me personally. He told me this on several different occasions. Sometime in the spring of 1974 was the first time he told me I was being wiretapped. He stated he had incurred the enmity of the security organizations and they were attempting to find anything on any of his friends that could be used against him and he was aware they had embarked on a campaign of wiretapping me.

The next time Gravitt told me Bell was wiretapping me was during a discussion about Bell using the F.B.I. in an attempt to get some information to discredit Gravitt.

Ashley was asked:
"What did Mr. Gravitt say?"

And he answered:
"He was angry, hurt. He expressed the opinion to me that there was absolutely nothing at all that the ex-intelligence agents of the security people would stop at in order to achieve their ends or the ends of those who gave them instructions, and he again informed me that, I remember, that I was wiretapped, and that from then on we must begin a system of talking to one another by code and by safe telephone."

Ashley continued to testify substantially as follows:

The next time Mr. Gravitt told me that I was being wiretapped by Bell was the week of the Oklahoma-Texas game "after my suspension on June the 9th". Gravitt told me about a conversation he had with L. C. Bailey, Vice-President of Bell, who was Gravitt's boss.

Ashley was asked:
"What did he say, Mr. Ashley?"

And he answered:
"He was angry. He said, 'Jim, I told you to use safe telephones. You didn't.' I

said, 'What do you mean, I didn't?' He said, 'What does the name 'Ralph Nader' do to you?' I advised him that I thought and I advised him that upon recollection I had only used that one time in a conversation, and I had used it on a conversation from my home and I had jokingly at the time indicated that perhaps I would just become the Ralph Nader of the telephone company or something to that effect. He informed me that Mr. Bailey had used those exact words and told him that 'Ashley is like a puppet dangling on a string and we know more about him—' And he had a big laugh over it. That they knew more about me than I knew about myself and he knew everything I was doing and he knew everybody I was calling and knew what I was saying. And Gravitt protested it most strongly. He totally demanded he stop. Bailey said, 'Stay out of it, Gravitt, it is not your affair.' "

Ashley continued to testify substantially as follows:

Gravitt told me that Bell was wiretapping him. He told me that a number of times.

Ashley also testified to statements made to him by people representing Bell in positions of responsibility and in managerial capacities who allegedly told him they had been confronted with evidence of his contacts with them on long distance calls by Bell. Ashley testified these people informed him that Bell knew all about their conversations and they could not afford to talk to him.

The court admitted this hearsay evidence as declarations against interest or as admissions as an exception to the hearsay rule. He also admitted this hearsay evidence not for the truth of the matter but only on the question of whether the conversations occurred.

T. O. Gravitt died in October, 1974. Ashley's testimony relative to his conversations with Gravitt took place sometime in the spring of 1974. The court ruled, "The only purpose for which all of this line of testimony, and all of the questioning that predates November 15th is permitted is simply to set the stage for what is happening after November the 15th".

In *Le Sage v. Pryor*, 137 Tex. 455, 154 S.W.2d 446 (1941), the court said:

"Declarations of an agent or employee are admitted against the principal or employer as an exception to the hearsay rule and to make them admissible the facts must bring them clearly within the limitations of the exception. Not only must such declarations be made within the course of the employment, but they must bear close relation to the performance of an authorized duty or act in connection with which they are made. They must not be purely voluntary or made merely in casual conversation. *Hinson v. Ely Walker & Co.*, 65 Tex. 103; *Southern Surety Co. v. Nalle & Co.*, Tex.Com.App., 242 S.W. 197; McCormick & Ray's Texas Law of Evidence, pp. 658–662, Sec. 508."

In *Deaton & Son v. Miller Well Servicing Co.*, 213 S.W.2d 944 (Tex.Civ.App.—Amarillo 1950, no writ), the court said:

"Some very definite rules governing the admissibility of declarations of agents or employees as against the principal or employer are laid down in Fletcher Cyclopedia Corporations, Volume 2, beginning on page 723, Section 734. Such authority is recognized by the Texas courts as well as many other jurisdictions. Some of the pertinent rules there stated are: (1) that the fact of agency must be established before the declarations can be admitted and such agency must be established by evidence other than the declarations of the alleged agent; neither can the authority of an alleged agent be established by the declarations, acts or conduct of such agent alone; (2) that the admission or declaration must have been made in regard to a matter within the scope of the authority of the agent; (3) that it must appear that the alleged agent, at the time he made the declarations, was engaged in executing the authority conferred upon him, and that the declaration related to and was connected with the business then pending; such

declaration must be made officially and not as an individual; (4) that the declaration must be made contemporaneously with the act to which it relates or practically so and a declaration as to past events is not admissible; (5) that the declaration must be of such a nature as to be part of the transaction, either accompanying the act or must be of such a nature as to unfold its character or quality; (6) that the declaration must be one of fact as distinguished from a mere expression of an opinion."

In *Southland Corporation of Texas v. Doss,* 408 S.W.2d 557 (Tex.Civ.App.—San Antonio 1966, no writ), the court said: ". . . Since the statement by the manager was made two or three days after the accident, it amounted to a mere narration of past facts and was not admissible against defendant. *Southwestern Telegraph & Telephone Co. v. Gotcher,* 93 Tex. 114, 53 S.W. 686 (1899); *Edwards v. Montgomery Ward & Co.,* Tex. Civ.App., 270 S.W.2d 432, wr. ref. n.r.e."

In 2 McCormick & Ray, Texas Evidence § 1121 (1956), it is said:

"Leading text-writers have taken the view that the sole purpose of admissions is to impeach the contentions made by the admitter in the present action. In other words, they perform the same function against a party which prior contradictory statements perform against a witness. They are used, not to prove the truth of the facts asserted, but to discredit the party. This contention, however, is contrary to the overwhelming weight of authority. The courts have not only drawn a distinction between prior contradictory statements of witnesses and admissions of parties but have relied upon admissions as affirmative substantive evidence, sufficient in many instances to support a cause of action or defense.

It being an established fact that admissions are received as evidence of the truth of the matter asserted in them, the conclusion is inevitable that they fall within the prohibition of the hearsay rule and are received as an exception to that rule . . . ."

Ashley's testimony that Gravitt told him that Bailey told Gravitt, "Stay out of it, Gravitt, it is not your affair" and Ashley's testimony that Gravitt told him, "that from then on we must begin a system of talking to one another by code and by safe telephone" would indicate Gravitt was not acting within the scope of his authority in making admissions on behalf of Bell. It does not appear that Gravitt was engaged in exercising authority conferred upon him by Bell or that his declarations related to Bell's then pending business. Neither does it appear that such declarations were made officially. All of the declarations were made with reference to past events.

We hold Ashley's testimony relating to conversations he had with Gravitt concerning wiretapping and eavesdropping by Bell was erroneously admitted. Ashley's testimony relative to statements made to him by district managers and people in responsible positions with Bell was also erroneously admitted because it did not come within any exception to the hearsay rule. *Big Mack Trucking Company, Inc. v. Dickerson,* 497 S.W.2d 283 (Tex.1973).

The record conclusively establishes Bell has the technological capacity to wiretap, eavesdrop, and intercept telephone conversations. However, we find no evidence to support the Ashleys' allegations that Bell wiretapped their telephone and intercepted telephone conversations between them and others. The evidence of wiretapping related to instances when Bell cooperated with law enforcement officials and toll fraud matters, and instances unrelated to the fact submitted in Special Issue No. One.

Mrs. Duval, a next-door neighbor of the Ashleys for about two years, testified substantially as follows:

Beginning in October of 1974 through March of 1975, Mr. Ashley frequently used our telephone. He would use our phone on an average of once a day. Some days they would make several calls. He had an active telephone at the times he was using our telephone. The reason

he used our phone rather than his own was "They felt their phone was tapped". After Mr. Ashley was dismissed, he sold their home to Mrs. O'Mara.

In the summer of 1975, three of us were by our driveway by the flower bed and there was an instrument found. By the three of us, I mean Mrs. O'Mara, a telephone serviceman and me. The instrument appeared to be something like a battery. It looked like a battery to me. "I am not sure what it was." It was about six or seven inches tall and approximately four across. The serviceman dropped the instrument back into the flower bed where we were discussing it. It was not dug into the flower bed. It was just laying by an air conditioning unit. This was in the yard where the Ashleys used to live. The Bell telephone man said this instrument could have been something used for wiretapping. In about three weeks, the Ashleys came to our house and I gave them the instrument or battery that we found.

With reference to the methods of wiretapping, James H. Ashley testified:

"A Mr. Maloney, there are two ways to wiretap. Number one is at the customer's physical premises. That is the only way you can do it, right at the customer's premises without the cable pair numbers. If you want to wiretap at any other location it's an impossibility without cooperation of the telephone company to get the exact cable pairs. There's no way you can do it. No way.

Q Now is that because the telephone company alone has a cable pair number? Is that what you're telling us?

A In their assignment office, in their cable records, they have the pair number and there is no way, and I recognize I'm setting myself up to challenge later, but I'll say again, there's no way outside of doing it right at the customer's house that it can be done without the cable pairs and cooperation of someone within the telephone company. So if there's

any wiretap located anywhere outside of right at the customer's premises, there has to be telephone company personnel help or they have to get the records from the telephone company."

Mr. Ashley testified about the battery substantially as follows:

We had the battery. It was just a regular battery. I had seen dozens. It had two screw-type terminals. That is all I know about it. I was advised to lock it in a safe place and I did. I placed this battery in this locked place sometime in September or October of 1975. My contention is that somebody placed the battery in the flower bed and it was left there for someone to find in conjunction with the wiretap. I knew the battery was a Bell product and I think it is a Bell product used in a wiretap. I don't know whether it was placed by a Bell service representative or a hired agent. I don't have any idea who placed it there.

I locked the battery in a file drawer in my office in Blanco, Texas, and it disappeared.

Ashley's expert witness, Patterson, testified substantially about the battery:

In my opinion, the battery found in the flower bed could be significant in the field of wiretapping, but without examining it I could not give an absolute opinion. No one showed me the battery. Today is the first time I have been asked about the battery.

 Mrs. Duval's testimony concerning the use of her telephone by the Ashleys does not constitute any evidence of probative value on the facts submitted in Special Issue No. One. Her testimony the Ashleys "felt their phone was tapped" was erroneously admitted because it was not admissible under any exception to the hearsay rule.

The court's charge on circumstantial evidence informed the jury: "A fact may be established by circumstantial evidence when it is fairly and reasonably inferred from other facts proved."

May we infer from this circumstantial evidence relating to the battery in connection with other circumstances in evidence that Bell's agents, servants or employees wiretapped or eavesdropped and intercepted conversations between the Ashleys and other persons? We hold this cannot fairly or reasonably be inferred and the battery evidence does not constitute any evidence of probative value.

Appellees rely on *Garrett v. Standard Fire Insurance Company of Hartford, Connecticut,* 541 S.W.2d 635 (Tex.Civ.App.—Beaumont 1976, writ ref. n.r.e.). The court said:

". . . See *Joy v. Liverpool, London & Globe Ins. Co.,* 32 Tex.Civ.App. 433, 74 S.W. 822, 825 (San Antonio 1903, writ ref'd), wherein the court held:

'In the proof of an issue of such a character as arson, involving, as it does, such moral turpitude and criminal intent, every circumstance tending to prove the guilt of the party charged with the commission of the offense is admissible in evidence.'"

We approve the authority quoted, but hold the battery evidence does not constitute a circumstance tending to prove any of the facts set out in Special Issue No. One.

Mrs. Stokes' testimony about letting two men, one a Bell repair man, into the Ashleys' home to repair their telephone in October, 1974, the testimony about noises and cross-talk on the Ashleys' telephone, and all the other circumstantial evidence relied on by appellees has been considered, and we find these circumstances do not tend to prove the facts in issue in Special Issue No. One. The evidence has been considered according to the standard set out in *Martinez v. Delta Brands, Inc.,* 515 S.W.2d 263 (Tex. 1974):

"When a party asserts that there is no evidence to support jury findings, we must review the evidence in its most favorable light, considering only the evidence and inferences which support the findings, and rejecting the evidence and inferences contrary to the findings. *Butler v. Hanson,* 455 S.W.2d 942 (Tex.1970);

*Langlotz v. Citizens Fidelity Insurance Company,* 505 S.W.2d 249 (Tex.1974). It would be our duty to affirm the judgment of the Court of Civil Appeals if the evidence offered to show negligence were proven to be no more than a scintilla of proof. Thus if the evidence created nothing more than a mere surmise or suspicion of the existence of negligence, such evidence would be, in legal effect, no evidence. *Joske v. Irvine,* 91 Tex. 574, 44 S.W. 1059 (1898). But if negligence may be reasonably inferred from direct evidence, then there is more than a scintilla of evidence. Calvert, 'No Evidence' and 'Insufficient Evidence' Points of Error, 38 Texas Law Review 361, 363 (1960)."

Referring to their expert witness, Patterson, in their Response to Appellant's Reply Brief, appellees say:

". . . Mr. Patterson's opinion that Appellees' phone had been wiretapped had technical and scientific support, namely, the two wires near the telephone in the wall of the house. Because of Mr. Patterson's experience with wiretaps and phone electronics in general, his opinion that the Ashleys' phone had been tapped was helpful to the jury . . ."

Patterson was asked:

"Q Right. With reference to your electronics background, do you hold yourself out as an expert in that field insofar as the ascertainment of wire tappings is concerned?"

And he answered:

"A I have been considered by most everybody to be in an electronics expert in the field of wire tapping."

Patterson testified substantially as follows:

I met Mr. Ashley and he requested me to determine if his telephone was wiretapped. I didn't have any equipment with me at the time, but I went to his house and examined several of his instruments and particularly one that we found that had a wiring problem. This was in the latter part of 1974. I examined two or three of his telephones. I found noth-

ing significant about the telephones in the garage and bedroom. I examined the telephone in the kitchen area between the kitchen and the den and found a built-in two-line set. I took this one out of the wall and found a maze of wiring there. Not having my equipment, I could not determine what I had found. I found an attachment to the black and red wire "which it is possible to turn a telephone into a room bug, and I advised him of this." This significant attachment had two extra wires. This was the first time I had ever seen a telephone like that. It was a unique phone that fit into the wall and had the ability to have two lines on it. I could see no reason why those two wires should be attached to the black and red wire.

Over a month later, I made a further investigation of the two wires and that would have been the first or second week in January, 1975, when I was over here with my equipment.

". . . It's not like a regular hand set. It was built into the wall, so we took it out of the wall and I went directly to the place where the—where these microphone wires terminate that goes around the hook switch so that—to determine whether or not that indeed it was tapped at the time.

THE COURT: At that time.

—at that time. And I then traced the two wires out by placing a 1,000-cycle tone so that I could trace the wires, and we traced this particular extra wires out that had been drilled through to the back of the wall to the outside of his house. Now, when I went around to the outside of the house I found these two wires that had been cut at that time, so they were going nowhere, and—"

I arrived at an opinion as to whether or not Ashley's telephone had been tapped. My opinion was "that there's no other explanation that could be made for those particular extra wires . . . for those two particular extra wires being on that telephone other than someone trying to receive some type of surreptitious interception of oral communication within the house itself."

It is my opinion it had been tapped at some time.

He was asked the following questions and he gave the following answers:

"Q All right, sir. Could you be definitive as to what time it had been tapped—

A No, sir.

Q —in the way of a time frame?

A No, sir, I couldn't because there's no way I could have—in other words, the first that I—that I looked at the phone I knew the wires should not be there. The second time that I checked it with the instruments to trace the wires the exterior wires in the back of the house had been cut, so there's no way I could say definitely at what time it was there."

I am going to say at some time that telephone was tapped. "I said before in 1975 that there was a high degree of probability that it was indeed tapped."

"A I say could, but I am going to say stronger than could, and only because I wasn't pinned down and asked. You've pinned me down and asked. I'm going to say that at some time somebody—I don't know who it was—tapped that phone.

Q You haven't the slightest idea who that was?

A I have no idea.

Q If it was?

A There's no way I could, no sir. I never found the wire going anywhere; I found them cut."

He continued to testify substantially as follows:

I did not find a tap the first time I checked Ashley's telephone and I didn't find a tap when I came back in January of 1975. The last time I checked it, I found evidence that it had been tapped at some time.

■ We have concluded the evidence creates nothing more than a mere surmise or

suspicion on the Ashleys' allegations of eavesdropping and wiretapping. We find no evidence to support the answers to Special Issue No. One.

The judgment is reversed and judgment rendered that the Ashleys take nothing.