COMMONWEALTH & others *vs.* FREDERICK WISEMAN & others.[1]

Suffolk.   May 6, 1969. — June 24, 1969.

Present: WILKINS, C.J., SPALDING, WHITTEMORE, CUTTER, & SPIEGEL, JJ.

*Privacy. Equity Jurisdiction,* Privacy. *Commonwealth,* As parens patriae. *Motion Picture. Mentally Ill Person. State Hospital. Public Interest. Constitutional Law,* Freedom of speech and press. *Equity Pleading and Practice,* Decree. *Trust,* Constructive trust.

Evidence reported in a suit in equity justified findings of the trial judge that representations by one, seeking permission to make an educational documentary film of activities in the Bridgewater State Hospital, to officials concerned that only pictures of inmates "legally competent to sign releases" would be used, that "the question of competency would . . . be determined by the Superintendent and his staff," and that a written release would be obtained from each inmate portrayed were a part of the arrangement under which making of the film was permitted, and that in the film made some of the inmates identified were incompetent to understand a release and that releases were obtained only from a few of the numerous inmates depicted.   [257]

The Commonwealth, as parens patriae, had standing to secure proper injunctive relief against exhibition of a film of activities of inmates confined in the Bridgewater State Hospital showing identifiable inmates in degrading situations, some naked or displaying distressing mental symptoms, and constituting a collective, indecent intrusion into the most private aspects of their lives, made by a producer who had failed to comply with a condition upon which he had been permitted to make the film, that he would obtain valid written releases from all persons portrayed.   [258–259]

In a suit in equity by the Commonwealth as parens patriae to enjoin exhibition of a film made by the defendant showing activities of inmates and conditions at the Bridgewater State Hospital, where it appeared

---

[1] The other plaintiffs are Charles W. Gaughan, as Superintendent, Massachusetts Correctional Institution, Bridgewater; John A. Gavin, Commissioner of Correction, and James C. Bulcock (an inmate of Bridgewater) by Gaughan as his guardian.   The defendants, other than Mr. Wiseman, are Bridgewater Film Company, Inc. (BFC), Grove Press, Inc. (Grove), and Titicut Follies Film Distributing Company, Inc. (TFFDC).   The proceedings against Mr. Wiseman and BFC, on November 17, 1967, were severed from those against Grove and TFFDC, each a New York corporation.   The case proceeded only against Mr. Wiseman and BFC.   Mr. Wiseman organized BFC on November 14, 1966.   The judge concluded that it was "merely an instrument created . . . for the . . . commercial exploitation of the film" and is essentially Mr. Wiseman's alter ego.

that the defendant did not comply with conditions imposed on the privilege of making the film, that, through his wide ranging photography, he abused the privilege by showing identifiable inmates naked or in other embarrassing situations, and that each individual portrayed was only important to the film as an inmate suffering from some form of mental disease and undergoing a particular type of custody or treatment, it was held that in the circumstances the final decree should prohibit showing of the film to the general public in order to protect the inmates' rights of privacy [261]; but that, since the film gave a striking and instructive picture of the life and problems at the institution, the final decree, in the public interest, should permit showing of the film to specialized audiences of persons with a serious interest in rehabilitation and with potential capacity to be helpful [262–263].

The record in a suit in equity by the Commonwealth as parens patriae against the producer of a film showing the activities and conditions at the Bridgewater State Hospital did not provide an appropriate basis for recovery of compensatory damages by any particular inmate there for an invasion of his privacy through a depicting of him in the film without his consent, or show any occasion for imposing a constructive trust on the defendant with respect to receipts for past showings of the film. [264]

BILL IN EQUITY filed in the Superior Court on September 22, 1967.

The case was heard by *Kalus*, J.

*James D. St. Clair* (*Blair L. Perry* with him) for the defendants Frederick Wiseman & another.

*George C. Caner, Jr.,* Special Assistant Attorney General, for the plaintiffs.

*Henry P. Monaghan,* for Civil Liberties Union of Massachusetts, amicus curiae, submitted a brief.

*Martin Levine,* of the District of Columbia, & *Harold S. H. Edgar,* of New York, for The American Orthopsychiatric Association, amicus curiae, submitted a brief.

*Sherwood B. Smith, Jr.,* of the District of Columbia, for The American Sociological Association, Inc., amicus curiae, submitted a brief.

CUTTER, J. This bill seeks, among other relief, to enjoin all showings of a film entitled "Titicut Follies," containing scenes at Massachusetts Correctional Institution at Bridgewater (Bridgewater), to which insane persons charged with crime and defective delinquents may be committed. See G. L. c. 125, § 19, as amended through St. 1967, c. 619, § 2.

The film was made between April 22, and June 29, 1966. Mr. Wiseman and Bridgewater Film Company, Inc. (BFC) appeal from an interlocutory decree, an order for a decree, and the final decree which enjoins showing the film "to any audience" and requires Mr. Wiseman and BFC to deliver up to the Attorney General for destruction specified films, negatives, and sound tapes. The plaintiffs appeal from the final decree because it did not order sums realized by various defendants from showing the film to be held for distribution as the court might direct.

The trial judge made a report of material facts. The evidence (2,556 pages of proceedings on eighteen trial days and sixty-four exhibits) is reported. The facts, except as otherwise indicated, are stated on the basis of the trial judge's findings and certain exhibits. The film has been shown to the Justices participating in this decision.

In 1965, Mr. Wiseman first requested permission from the Superintendent and from the Commissioner to make an educational documentary film concerning Bridgewater. His first request was denied. On January 28, 1966, permission was granted, subject to the receipt of a favorable opinion from the Attorney General (that the officials could grant permission) and to the conditions (a) that "the rights of the inmates and patients . . . [would be] fully protected," (b) that there would be used only "photographs of inmates and patients . . . legally competent to sign releases," (c) that a written release would be obtained "from each patient whose photograph is used in the film," and (d) that the film would not be released "without first having been . . . approved by the Commissioner and Superintendent." The existence of the final condition was the subject of conflicting evidence but there was oral testimony upon which the trial judge could reasonably conclude that it had been imposed.

The then Attorney General (Mr. Brooke) on March 21, 1966, advised that "the Superintendent may, if he deems it advisable, permit Mr. Wiseman to make his film at" Bridgewater. Permission was then given.

In April, 1966, Mr. Wiseman and his film crew started work at Bridgewater. They were given free access to all departments except the treatment center for the sexually dangerous, whose director made "strong objections" in writing to any photography there without compliance with explicit written conditions. In three months, 80,000 feet of film were exposed. Pictures were made "of mentally incompetent patients . . . in the nude . . . [and] in the most personal and private situations."

In approaching the Commissioner and the Superintendent, Mr. Wiseman had indicated that he planned a documentary film about three people: an adult inmate, a youthful offender, and a correctional officer. It was to be an effort "to illustrate the various services performed — custodial, punitive, rehabilitative, and medical." The judge concluded (a) that the "plain import of [Mr.] Wiseman's representations was that his film was to be . . . non-commercial and non-sensational," whereas, in the judge's opinion, it was "crass . . . commercialism"; (b) that, in fact, the film "constitutes a most flagrant abuse[2] of the privilege . . . [Mr. Wiseman] was given"; and (c) that, instead of "a public service project," the film, as made, is "to be shown to the general public in movie houses."

The Superintendent first saw the film on June 1, 1967, and objected, among other things, "to the excessive nudity." The then Attorney General (Mr. Richardson) also saw the film in June, 1967, and raised several questions. At a conference on September 21, 1967, Mr. Wiseman and his legal advisers were told by the Attorney General "that in his opinion the film constituted an invasion of the privacy of the inmates shown in the film; that mentally incompetent patients were shown . . . and that the releases, if any, ob-

---

[2] Among the findings are the following: The film "is a hodge-podge of sequences . . . depicting mentally ill patients engaged in repetitive, incoherent, and obscene rantings . . . . The film is excessively preoccupied with nudity. . . . [N]aked inmates are shown desperately attempting to hide . . . their privates with their hands. . . . There is a scene of . . . [a priest] administering the last rites of the church to a dying patient [and] the preparation of a corpse for burial. . . . A . . . patient, grossly deformed by . . . congenital brain damage, is paraded before the camera."

tained by [Mr.] Wiseman were not valid." The Commissioner saw the film "for the first time on . . . September 21, 1967." On the next day, he notified Mr. Wiseman "that the film could not be shown 'in its present form.'"

In September, 1967, Mr. Wiseman made an agreement with Grove for distribution of the film for "showing to the general public . . . throughout the United States and Canada," with Mr. Wiseman to receive "50% of the theatrical gross receipts, and 75% from any television sale." Grove, for promotion of the film, was to have "complete control of the manner and means of distribution." The film was shown privately, and to the public for profit, in New York City in the autumn of 1967.

The trial judge ruled, inter alia, (a) that such "releases as may have been obtained [from inmates] are a nullity"; (b) "that the film is an unwarranted . . . intrusion . . . into the . . . right to privacy of each inmate" pictured, degrading "these persons in a manner clearly not warranted by any legitimate public concern"; (c) that the "right of the public to know" does not justify the unauthorized use of pictures showing identifiable persons "in such a manner as to . . . cause . . . humiliation"; (d) that "it is the responsibility of the State to protect" the inmates "against any such . . . exploitation"; and (e) that the Commonwealth is under "obligation . . . to protect the right of privacy of those . . . committed to its . . . custody."[3]

Reactions to the film set out in the record vary from the adversely critical conclusions of the trial judge to those expressed by witnesses [4] who regarded it as fine journalistic

---

[3] The judge ruled that the Commissioner and the Superintendent, as individuals and as officials, had no standing as plaintiffs; that an inmate, through the Superintendent as his guardian, could be a plaintiff; and that the Commonwealth could seek injunctive relief, both as a party to the contract made with Mr. Wiseman and in behalf of the inmates.

[4] Witnesses who regarded the film as valuable included a professor of sociology at the Harvard Law School, the film critic for Life (the magazine), the retired director of the Nieman Fellowships at Harvard, the dean of the Boston University School of Public Communication, an associate professor of psychiatry at Tufts Medical School, a professor of law at Yale, and others.

reporting, as education, and as art.[5]   The Attorney General
(Mr. Richardson) testified that the film "was impressive in
many ways . . . powerful in impact."   He, however, ex-
pressed concern about the problem of obtaining valid re-
leases, even from those "conceivably competent," since the
releases would have been given before the inmates "could
have any idea how they would be depicted."   There was
testimony from experts about the value of the film for in-
struction of medical and law students, and "exposure of
conditions in a public institution." [6]

1. We are in as good a position as the trial judge to ap-
praise the film and to determine to what extent (a) its ex-
hibition may invade rights of inmates to privacy, or (b) its
suppression may interfere with countervailing interests.   We
may reach our conclusions about the film as documentary
evidence, unaffected by findings by the trial judge. See
*Berry* v. *Kyes,* 304 Mass. 56, 57–58; *Skil Corp.* v. *Barnet,*
337 Mass. 485, 488; *F. A. Bartlett Tree Expert Co.* v. *Bar-
rington,* 353 Mass. 585, 586, fn. 1.   As to findings based in
part upon oral evidence, we decide the case according to
our judgment, giving due weight to the judge's findings
according to our usual standards of review.   See *Lowell Bar*

---

[5] For example the *Life* review said, in part, "The Bridgewater atmosphere
is one of aimless hopelessness . . . .   A psychiatrist turns an interview with
an inmate into a sadistic baiting, or, with malicious cheerfulness, force-feeds
a dying old man, while we wonder whether the ash from the doctor's carelessly
dangling cigarette is really going to fall into the glop being funneled into the
convulsively shuddering throat.   A society's treatment of the least of its
citizens . . . is perhaps the best measure of its civilization.   The repulsive
reality . . . forces us to contemplate our capacity for callousness.   No one
seeing this film can but believe that reform of the conditions it reports is
urgent business . . . .   We cannot forget that . . . [the] 'actors' are there
to stay, trapped in their own desperate inventions.   When a work achieves
that kind of power, it must be regarded as art . . . ."

[6] The former director of the division of legal medicine of the State Depart-
ment of Mental Health, now teaching at the Tufts Medical School, in a
letter in evidence, commented, "Even though I was an experienced psychia-
trist and had . . . worked on violent . . . mental hospital wards and maxi-
mum security prisons, Bridgewater was the first institution where I ever felt
personally in danger.   My reaction . . . would border on despair each time
I went.   When I would leave I would quickly put the place out of my
mind . . . .   [T]he film in . . . [a] painful way revived the old feelings
of depression and . . . anger at myself for continuing to ignore the prob-
lem. . . . [I]n a small way my reactions are a clue to why [such] institu-
tions . . . exist.   There are some things we prefer not to know about . . .
not too unlike the Germans who lived near Dachau."

*Assn.* v. *Loeb,* 315 Mass. 176, 178; *Jones* v. *Jones,* 349 Mass. 259, 261–262. See also *Colbert* v. *Hennessey,* 351 Mass. 131, 134.

2. The Commissioner and the Superintendent would have acted wisely if they had reduced any agreement to writing rather than to have risked the misunderstandings possible in oral discussions. They also might have avoided dispute if they had supervised the filming itself much more closely. We, however, need not decide whether the judge on conflicting evidence, largely oral, was plainly wrong in concluding that Mr. Wiseman had agreed to abide completely by the officials' judgment. We think that, in any event, he did not comply adequately with at least two other conditions reasonably imposed upon him before permission to make the film was granted.

Early in the negotiations, Mr. Wiseman represented in writing that only pictures of inmates "legally competent to sign releases" would be used and that the "question of competency would . . . be determined by the Superintendent and his staff." In the 1966 request for the Attorney General's opinion, Mr. Wiseman was quoted as giving assurance that a written release would be obtained "from each . . . patient whose photograph is used." The latter assurance was quoted in the opinion (March 21, 1966) stating that the Superintendent had power to permit the film to be made. In the circumstances, the judge reasonably could conclude that these representations were a part of the arrangement.

The judge was also clearly justified in deciding on the basis of expert testimony, that some of sixty-two inmates identified as shown in the film were incompetent to understand a release and, on the basis of a stipulation, that releases were obtained only from eleven or twelve of the numerous inmates depicted. There was ample basis for concluding that Mr. Wiseman had not fulfilled important undertakings clearly designed to assure that the film would show only those consenting in writing to their appearance in the film and competent to understand and to give such consent.

3. The film shows many inmates in situations which
would be degrading to a person of normal mentality and
sensitivity. Although to a casual observer most of the in-
mates portrayed make little or no specific individual im-
pression, others are shown in close-up pictures. These
inmates are sufficiently clearly exhibited (in some instances
naked) to enable acquaintances to identify them. Many
display distressing mental symptoms. There is a collec-
tive, indecent intrusion into the most private aspects of the
lives of these unfortunate persons in the Commonwealth's
custody.

We need not discuss to what extent in Massachusetts
violation of privacy will give rise to tort liability to indi-
viduals. See *Frick* v. *Boyd*, 350 Mass. 259, 264, and cases
cited; Restatement 2d: Torts (Tent. draft No. 13, April 27,
1967), §§ 652D–652E. See also Warren and Brandeis, The
Right to Privacy, 4 Harv. L. Rev. 193; and (for references
to more recent articles) Kalven, Privacy in Tort Law —
Were Warren and Brandeis Wrong? 31 Law & Contemp.
Prob. 326. We think, in any event, that Mr. Wiseman's
massive, unrestrained invasion of the intimate lives of these
State patients may be prevented by properly framed in-
junctive relief. The Commonwealth has standing and a
duty to protect reasonably, and in a manner consistent
with other public interests, the inmates from any invasions
of their privacy substantially greater than those inevitably
arising from the very fact of confinement. See *Ex parte
Sturm*, 152 Md. 114, 119–120.

There is a "general power of the Legislature, in its ca-
pacity as parens patriae, to make suitable provision for
incompetent persons." A "comprehensive system for their
care and custody" is contained in G. L. c. 123. See *Dubois,
petitioner*, 331 Mass. 575, 578–579. See also *Shapley* v.
*Cohoon*, 258 Fed. 752, 755 (D. Mass.), remanded on other
grounds 255 Fed. 689 (1st Cir.). The Legislature has ex-
ercised that power with specific reference to Bridgewater,
among other institutions. See G. L. c. 125, § 14 (as amended
through St. 1957, c. 777, § 5), § 18 (inserted by St. 1955,

c. 770, § 11), § 19 (as amended through St. 1967, c. 619, § 2). These general provisions import all reasonable power, and the duty, to exercise proper controls over the persons confined and the conditions of their custody (cf. *Maas* v. *United States*, 371 F. 2d 348 [Ct. App. D. C.]) and to afford the inmates protection and kindness consistent with the terms and rehabilitative purposes of their commitments. See G. L. c. 127, § 32 (as amended through St. 1957, c. 777, § 11). The Commissioner and Superintendent, under reasonable standards of custodial conduct, could hardly permit merely curious members of the public access to Bridgewater to view directly many activities of the type shown in the film. We think it equally inconsistent with their custodial duties to permit the general public (as opposed to members of groups with a legitimate, significant, interest) to view films showing inmates naked or exhibiting painful aspects of mental disease. See *York* v. *Story*, 324 F. 2d 450, 454–456 (9th Cir.), cert. den. 376 U. S. 939. See also *Myers* v. *Afro-Am. Publishing Co. Inc.* 168 Misc. (N. Y.) 429, 430–431 (Supr. Ct.), affd. 255 App. Div. (N. Y.) 838; *Myers* v. *United States Camera Publishing Corp.* 9 Misc. 2d 765, 766–768 (N. Y. City Ct.); 1934 Op. N. Y. Atty. Gen. pp. 374, 375.

These considerations, taken with the failure of Mr. Wiseman to comply with the contractual condition that he obtain valid releases from all persons portrayed in the film, amply justify granting injunctive relief to the Commonwealth. The impracticality of affording relief to the inmates individually also supports granting this collective relief to the Commonwealth as parens patriae, in the interest of all the affected inmates. We give no weight to any direct interest of the Commonwealth itself in suppressing the film.[7]

---

[7] Compare the intimations in *Kelley* v. *Post Publishing Co.* 327 Mass. 275, 278, and *Brauer* v. *Globe Newspaper Co.* 351 Mass. 53, 58, denying any direct right of privacy in any person other than the immediate victim. These intimations seem inapplicable to the quasi-fiduciary interests asserted by the Commonwealth. These interests, we assume, are not a matter of Federal law as to content and protection, but are "left largely to the law of" Massachusetts. See *Katz* v. *United States*, 389 U. S. 347, 350–351.

4. The defendants contend that no asserted interest of privacy may be protected from the publication of this film because the conditions at Bridgewater are matters of continuing public concern, as this court has recognized. See *Nason* v. *Commissioner of Mental Health*, 351 Mass. 94, 98; *Nason* v. *Superintendent of Bridgewater State Hosp.* 353 Mass. 604, 606–614.[8] Indeed, it was concern over conditions at Bridgewater which led various public officials in 1965 and 1966 to consider a documentary film, in the hope that, if suitable, it might arouse public interest and lead to improvement.

Even an adequate presentation to the public of conditions at Bridgewater, however, would not necessitate the inclusion of some episodes shown in the film, nor would it justify (cf. *Travers* v. *Paton*, 261 F. Supp. 110, 116–117 [D. Conn.]) the depiction of identifiable inmates, who had not given valid written consents and releases, naked or in other embarrassing situations. We agree with the trial judge that Mr. Wiseman's wide ranging photography amounted to "abuse of the privilege he was given to make a film" and a serious failure to comply with conditions reasonably imposed upon him.[9] Mr. Wiseman could hardly have fairly believed that officials, solicitous about obtaining consent and releases from all inmates portrayed, could have been expected to approve this type of film for general distribution.

The record does not indicate to us that any inmate shown in the film, by reason of past conduct, had any special news

[8] The latter case, decided February 5, 1968, discloses (see pp. 609, esp. fn. 6, and 611) some improvements in conditions at Bridgewater during 1967, the year after the film was made. In the present case, also, there was testimony, for example, that, after the film was completed, thirty-eight officers, fifty-five other persons engaged in rehabilitation, and three doctors had been added to the preëxisting Bridgewater staff.

[9] Even if no person portrayed objected to being photographed and even if no pictures were taken of persons who did object, the requirement of releases from persons competent to give them does not seem to us unreasonable. Cf. *Thayer* v. *Worcester Post Co.* 284 Mass. 160, 163–164; *Marek* v. *Zanol Prod. Co.* 298 Mass. 1, 3–4. Indeed, in view of the character of the film, we would not be disposed to give a release (even from an inmate capable of giving one) substantial significance until the inmate giving it had seen the film and fully understood how he was to be portrayed.

interest as an individual. Each inmate's importance to the film was that he was an inmate of Bridgewater, that he suffered from some form of mental disease, and that he was undergoing in the Bridgewater facilities particular types of custody and treatment. Recognizable pictures of individuals, although perhaps resulting in more effective photography, were not essential. In the circumstances, there will be no unreasonable interference with any publication of matters of public concern if showing the film to the general public is prevented (a) to protect interests of the inmates in privacy, and (b) because Mr. Wiseman went unreasonably beyond the scope of the conditional permission to enter, and take pictures upon, State owned premises properly not generally open for public inspection and photography. See *Adderley* v. *Florida*, 385 U. S. 39, 41, 47–48.

The case is distinguishable from decisions which have permitted publication of newsworthy events where the public interest in reasonable dissemination of news has been treated as more significant than the private interests in privacy. Cf. *Time, Inc.* v. *Hill*, 385 U. S. 374, 380–391; *Jenkins* v. *Dell Publishing Co. Inc.* 251 F. 2d 447, 450–452 (3rd Cir.), cert. den. 357 U. S. 921; *Mahaffey* v. *Official Detective Stories, Inc.* 210 F. Supp. 251, 253 (W. D. La.); *Hurley* v. *Northwest Publications, Inc.* 273 F. Supp. 967, 976 (D. Minn.), affd. 398 F. 2d 346 (8th Cir.). Cf. also *Kelley* v. *Post Publishing Co.* 327 Mass. 275, 278; *Spahn* v. *Julian Messner, Inc.* 21 N. Y. 2d 124, 127–129 (decided after *Julian Messner, Inc.* v. *Spahn* 387 U. S. 239). We need not now consider to what extent Mr. Wiseman could have been wholly excluded from making a film at Bridgewater. In this aspect of the case, we hold merely that he violated the permission given to him, reasonably interpreted, and did not comply with valid conditions (cf. note, 73 Harv. L. Rev. 1595, 1599–1602) that he obtain written releases.[10]

---

[10] The record suggests that Mr. Wiseman, who spent much uncompensated time and about $32,000 in the production, not only was interested in recovering his costs (which he apparently had not done at the time of trial)

We are aware, of course, that in *Cullen* v. *Grove Press, Inc.* 276 F. Supp. 727, 729–731 (S. D. N. Y.), a preliminary injunction against showing the film generally to the New York public was denied when such relief was sought by correction officers at the institution. The then plaintiffs, however, did not represent the inmates as the Commonwealth (as parens patriae) does in this case. We, in any event, decline to follow the broad interpretation given in the *Cullen* case to *Time, Inc.* v. *Hill*, 385 U. S. 374, 387–388.

5. That injunctive relief may be granted against showing the film to the general public on a commercial basis does not mean that all showings of the film must be prevented. As already indicated (see e.g. fns. 5, 6), the film gives a striking picture of life at Bridgewater and of the problems affecting treatment at that or any similar institution. It is a film which would be instructive to legislators, judges, lawyers, sociologists, social workers, doctors, psychiatrists, students in these or related fields, and organizations dealing with the social problems of custodial care and mental infirmity. The public interest in having such persons informed about Bridgewater, in our opinion, outweighs any countervailing interests of the inmates and of the Commonwealth (as parens patriae) in anonymity and privacy.

The effect upon inmates of showing the film to persons with a serious interest in rehabilitation,[11] and with potential capacity to be helpful, is likely to be very different from the effect of its exhibition merely to satisfy general public curi-

---

but also in entering the picture in various cinema art competitions. Mr. Wiseman doubtless desired to produce an effective "documentary," or a work of art which would win awards, or a film which would attract public patronage. In our opinion, no one of these purposes would justify the violation of the conditions or of the proper interests of the inmates. This is not an instance (cf. *Attorney Gen.* v. *The Book Named "Tropic of Cancer,"* 345 Mass. 11, 20) where judges or administrators may be regarded as attempting to be "arbiters of taste" or to determine for a producer what is "unnecessary" to his portrayal of particular scenes. Relief here is granted solely to afford protection to interests entitled to protection.

[11] The seemingly random and somewhat incoherent sequence (see fn. 2) of scenes, probably designed to give to the film an impressionistic character, is not likely to confuse seriously interested professional and student audiences. The film, even in its present form, may be highly informative to such specialized audiences.

osity. There is possibility that showings to specialized audiences may be of benefit to the public interest, to the inmates themselves, and to the conduct of an important State institution. Because of the character of such audiences, the likelihood of humiliation, even of identifiable inmates, is greatly reduced. In any event the likelihood of harm seems to us less than the probability of benefits.[12]

6. We think that the final decree (unrestricted as it is as to time, geographical scope, and audience) is too sweeping and that more precise and restricted relief against showing the film, and the dissemination of the information contained in it, is necessary. See the analogy of *Carroll* v. *President & Commrs. of Princess Anne,* 393 U. S. 175, 183–184. See also *Cox* v. *Louisiana,* 379 U. S. 536, 555–558; *United States* v. *Robel,* 389 U. S. 258, 265–266. The decree is to be modified to permit (according to standards to be defined in the decree) the showing of the film to audiences of the specialized or professional character already mentioned.

Mr. Wiseman, or those claiming through him, may make a charge for use of the film, so far as showing it may be permitted by the modified decree. In view of the lapse of time since the film was made, the modified decree should fairly require including in the film, for all permitted showings, a brief explanation that changes and improvements have taken place in the institution since 1966.

7. We perceive no reason for ordering destruction of film footage not included in the film exhibited to us. The decree should be modified to permit preservation of this material at the expense of Mr. Wiseman, if he wishes to save it, provided that no use shall be made of this material without the approval of the Superior Court.

8. The court shall retain jurisdiction of the case for the granting of such supplemental relief as from time to time may be appropriate under the modified decree.

---

[12] This type of balancing of conflicting public and private interests is generally comparable to that which may affect regulation of court room photography and television or the restriction of pre-trial publicity in criminal cases. Cf. *Tribune Review Publishing Co.* v. *Thomas,* 153 F. Supp. 486, 494–495 (W. D. Pa.), affd. 254 F. 2d 883, 884 (3rd Cir.).

9. The trial judge stated that the plaintiffs "do not seek any award of compensatory damages" for the violation of the inmates' rights to privacy. In any event, the present record is not an appropriate basis for a recovery by any particular inmate who may have suffered ascertainable damage. Indeed, the film may indirectly have been of benefit to some inmates by leading to improvement of Bridgewater. Injunctive relief affords the inmates the most effective, and probably the only useful, protection which can be given. We perceive no occasion for imposing, as the Commonwealth urges, a constructive trust upon receipts for past showings of the film.

10. The interlocutory decree with respect to the demurrer is affirmed. The final decree is reversed in order to permit its modification. A modified decree, consistent with this opinion, is to be entered. The Commonwealth is to have costs of appeal.

*So ordered.*