Argued and submitted September 3, 1985, Court of Appeals judgment reversed, judgment of circuit court reinstated January 7, 1986

ANDERSON,
*Respondent on Review,*

*v.*

FISHER BROADCASTING COMPANIES,
INC., dba KATU TV,
*Petitioner on Review.*

(TC A8302-00744; CA A30110; SC S31676)

712 P2d 803

John R. Faust, Jr., Portland, argued the cause for petitioner on review. With him on the petition were Schwabe, Williamson, Wyatt, Moore & Roberts, Portland.

Gregory Kafoury, Portland, argued the cause for respondent on review.

LINDE, J.

## LINDE, J.

A television cameraman for defendant broadcasting company photographed the scene of an automobile accident in which plaintiff was injured. Plaintiff was recognizable and was shown bleeding and in pain while receiving emergency medical treatment. Defendant did not use the video-taped pictures or report the accident on its regular news program. Some time later, without seeking plaintiff's consent, defendant used a brief excerpt showing plaintiff to illustrate promotional spots advertising a special news report about a new system for dispatching emergency medical help.

Plaintiff sued for general damages for mental anguish, alleging that defendant "violated plaintiff's right to privacy" by "appropriating to defendant's own use and advantage" the pictures its photographer had taken of plaintiff and by "publicizing" his picture in a condition "offensive to a reasonable person" and not of legitimate public concern. In defense, the broadcaster asserted that its use of plaintiff's picture occurred in advertising another news program, that this use was constitutionally privileged and that the undisputed facts gave rise to no common-law claim. The trial court gave summary judgment for defendant, holding that the pictures were "newsworthy," that they remained so despite not being promptly published, and that they did not lose their newsworthiness when used only to advertise another newsworthy broadcast.

The Court of Appeals held that there was an issue of fact whether the film showing plaintiff's injured condition was newsworthy, because it was not used to report plaintiff's accident itself but only to draw viewers for a different program in which the accident was not mentioned. The court did not discuss the parties' other legal theories beyond rejecting defendant's First Amendment claim. *Anderson v. Fisher Broadcasting Companies, Inc.,* 72 Or App 539, 696 P2d 1124 (1985).

■■ In this court, defendant again stressed its constitutional claims along with its common-law arguments, understandably so in defending against a tort claim for wrongful publicity to which media of mass communication are peculiarly vulnerable. The constitutional issues are significant. The right to "speak, write, or print freely on any subject

whatever" guaranteed by Article I, section 8, of the Oregon Constitution accommodates laws providing civil responsibility and remedies (though not punitive damages) for an "injury done another in his person, property, or reputation," as guaranteed in Article I, section 10, if the interest said to be injured falls within section 10 and if the defendant's expression meets the test of the word "abuse" in section 8.[1] *See Wheeler v. Green,* 286 Or 99, 118, 593 P2d 777 (1979) (defamation); *Hall v. The May Dept. Stores,* 292 Or 131, 145-46, 637 P2d 126 (1981) (intentional infliction of emotional distress in questioning an employee suspected of theft). The First Amendment status of tort claims such as those asserted here is unsettled.[2]

We therefore included the constitutional issues among the questions that we submitted to counsel before

---

[1] Article I, section 8, of the Oregon Constitution, provides:

"No law shall be passed restraining the free expression of opinion, or restricting the right to speak, write, or print freely on any subject whatever; but every person shall be responsible for the abuse of this right."

Article I, section 10, of the Oregon Constitution, provides:

"No court shall be secret, but justice shall be administered, openly and without purchase, completely and without delay, and every man shall have remedy by due course of law for injury done him in his person, property, or reputation."

[2] In *Zacchini v. Scripps-Howard Broadcasting Co.,* 433 US 562, 97 S Ct 2849, 53 L Ed 2d 965 (1977), the United States Supreme Court rejected a First Amendment defense to a claim for damages for appropriating the "professional property" of an entertainer by broadcasting his performance on a television news program without permission. *Cox Broadcasting Corp. v. Cohn,* 420 US 469, 95 S Ct 1029, 43 L Ed 2d 328 (1975), reversed a damage judgment for broadcasting the name of a rape victim that was obtained from a public record. Cases in which the publication is claimed to present plaintiff in a "false light" involve constitutional requirements of culpable error, *see Cantrell v. Forest City Pub. Co.,* 419 US 245, 95 S Ct 465, 42 L Ed 2d 419 (1974); *Time, Inc. v. Hill,* 385 US 374, 87 S Ct 534, 17 L Ed 2d 456 (1967). The approach taken in *Virgil v. Time, Inc.,* 527 F2d 1122, 1128 (9th Cir 1975), cited by plaintiff, that the right to publish is measured by the "public's right to know," is not, we think, an accurate statement of the First Amendment.

First Amendment limits on "privacy" claims against publication are discussed in Zimmerman, *Requiem for a Heavyweight: A Farewell to Warren and Brandeis's Privacy Tort,* 68 Cornell L Rev 291 (1983); Emerson, *The Right of Privacy and Freedom of Press,* 14 Harv CR - CL L Rev 329 (1979); Hill, *Defamation and Privacy Under the First Amendment,* 76 Colum L Rev 1205 (1976); Blousteín, *The First Amendment and Privacy: The Supreme Court Justice and the Philosopher,* 28 Rutgers L Rev 41 (1974); Nimmer, *The Right to Speak from* Times *to* Time: *First Amendment Theory Applied to Libel and Misapplied to Privacy,* 56 Calif L Rev 935 (1968); Franklin, *A Constitutional Problem in Privacy Protection: Legal Inhibitions on Reporting of Fact,* 16 Stan L Rev 107 (1963).

argument.[3] But we shall not decide this case on constitutional grounds when it is unnecessary to do so, and when a premature decision would foreclose legislative consideration.[4] In the present case, we hold that the undisputed facts do not give rise to a claim for damages. We therefore reverse the Court of Appeals and reinstate the judgment of the circuit court.

## I.  INVASION OF PRIVACY IN OREGON TORT LAW

Plaintiff asserts two grounds to hold the broadcasting company liable for causing him mental anguish. One is that the publicity defendant gave to plaintiff's injuries and pain concerned plaintiff's private life and would be offensive to a reasonable person. The other is that defendant appropriated plaintiff's recorded image without his consent to its own commercial purpose.

The question whether truthfully publicizing a fact

---

[3] The questions were:

"1. Is publication of a person's picture taken in a public setting, without defamation, misrepresentation, or an injurious motive, a tort in Oregon?

"2. If so, is there a defense of 'newsworthiness,' and by whom, by what standards, and on what evidence is 'newsworthiness' determined?

"3. This Court has held that defamation and intentional infliction of severe psychic or emotional distress are injuries for which a nonpunitive private remedy 'in due course of law' under Or Const Art I, § 10, is not precluded by Art I, § 8. Is the tort asserted in this case an 'injury' to plaintiff's 'person, property, or reputation' within the meaning of that section, and if so, is any specific degree of culpability required to constitute an 'abuse' of the freedom guaranteed in Article I, § 8?

"4. What limits does the First Amendment place on the definition of the tort asserted here?"

[4] The question would be whether one or another type of nondefamatory but abusive publication may be analogous to other injuries to "person, property, or reputation" for purposes of a nonpunitive civil remedy.

In the first decision basing a tort claim for wrongful publication of plaintiff's photograph expressly on a "right of privacy," *Pavesich v. New England Life Ins. Co.,* 122 Ga 190, 50 SE 68, 73 (1905), the Supreme Court of Georgia noted that invasion of the legal rights of another could be an "abuse" of the freedom to speak, write and publish, under a constitutional guarantee phrased much like Article I, section 8, of the Oregon Constitution, and that the right of privacy might have to yield to the rights of speech and of the press. The court continued:

"It is well recognized that slander is an abuse of the liberty of speech, and that a libel is an abuse of the liberty to write and print, but it is nowhere expressly declared in the law that these are the only abuses of such rights."

50 SE at 74. In citing these passages in *Pavesich,* we do not imply that they represent a correct analysis under Oregon's Article I, sections 8 and 10.

about a private individual that the individual reasonably prefers to keep private is, without more, a tort has not yet been squarely decided by this court.

We recently had occasion, in *Humphers v. First Interstate Bank,* 298 Or 706, 696 P2d 527 (1985), to review Oregon cases on "privacy" since *Hinish v. Meier & Frank Co.,* 166 Or 482, 113 P2d 438 (1941). In *Hinish,* plaintiff's name had been signed without his consent to a telegram urging the governor to veto a bill. In *Humphers,* 298 Or at 715, we noted:

> "An essential element in *Hinish* was the allegation that plaintiff's name was used without his consent and against his will, in other words, that using his name on the telegram was fraudulent. The case does not hold that it would be an actionable invasion of privacy to write the governor that 'Mr. Hinish, too, opposes this bill,' if Hinish had made such a statement to the writer. The false appropriation, not the potential public exposure of Hinish's actual views, constituted the tort."

There were three "privacy" cases in 1967. *Hamilton v. Crown Life Ins.,* 246 Or 1, 423 P2d 771 (1967), denied liability when an insurance agent showed potential customers his company's check to a widow whose husband was known in the community to have committed suicide. Judge Goodwin's opinion for the court, after assuming but not deciding that First Amendment constraints allow a "remnant" of tort liability for invasions of privacy, noted that the complaint alleged "no false attribution, no intrusion, and no appropriation of a commercially valuable testimonial or endorsement." 246 Or at 4. The agent's disclosure of a private matter was "offensive and boorish," but the court held that "the injury is not one that would justify resort to the courts for damages." *Id.* at 5-6.

In *Tollefson v. Price,* 247 Or 398, 430 P2d 990 (1967), defendant allegedly had included Mrs. Tollefson's name in advertising a list of delinquent debts for sale, wrongly stating that the debt was undisputed. We observed in *Humphers* that the Tollefsons' complaint alleged not only that the latter statement was factually false but also that it was made with the specific purpose to harass, vex and annoy the plaintiffs, and we noted that "[d]eliberately harassing debt collection methods may be tortious without publicity or 'invasion of privacy,'" 298 Or at 715, citing *Turman v. Central Billing*

*Bureau, Inc.,* 279 Or 443, 568 P2d 1382 (1977). The third case, *French v. Safeway Stores,* 247 Or 554, 430 P2d 1021 (1967), denied recovery when a store manager's note to store employees stated that plaintiff's relatives did not trust plaintiff to do his own shopping.

In a later case, a claim that an insurance company invaded plaintiff's privacy by surreptitious surveillance and filming of evidence to defeat a compensation claim resulted in a nonsuit because the surveillance was not "unreasonable," though the court affirmed nominal damages for the investigator's technical trespass on plaintiff's land. *McLain v. Boise Cascade Corp.,* 271 Or 549, 533 P2d 343 (1975). This court also refused to hold police officers liable for revealing to a newspaper, and the newspaper for publishing, the name and address of a rape victim in a police report that was a public record. *Ayers v. Lee Enterprises, Inc.,* 277 Or 527, 561 P2d 998 (1977).

Finally, *Humphers v. First Interstate Bank, supra,* held that a physician was not liable on a theory of "invasion of privacy" for revealing information that disclosed the identity of a former patient to the daughter whom she had given up for adoption, although the mother could proceed on a theory of breach of confidence in a confidential relationship. Plaintiff's interest qualified as a "privacy" interest under Oregon statutes, but this alone did not suffice to claim damages from anyone who caused injury to that interest. *Humphers,* 298 Or at 716-17. If the physician was liable, "it must result from an obligation of confidentiality beyond any general duty of people at large not to invade one another's privacy." *Id.* at 717.

The only decisions actually sustaining tort claims for invasion of privacy, therefore, have been *Hinish* and *Tollefson.* In each, the respective defendants' use of plaintiffs' name was false and "fraudulent" or made for an impermissible purpose. But the fact that the question of tort liability for truthful publication of "private" facts has not previously been decided does not in itself speak for one or the other answer. *See Norwest v. Presbyterian Intercommunity Hosp.,* 293 Or 543, 548, 652 P2d 318 (1982); *Hinish v. Meier & Frank Co., supra.* We must place the claim in the larger legal context.

■ Generally, Oregon decisions have not allowed recovery for injury to a stranger's feelings as such, unless the

infliction of psychic distress was the object of defendant's conduct or the conduct violated some legal duty apart from causing the distress. *See Norwest v. Presbyterian Intercommunity Hosp., supra,* 293 Or at 558-59, reviewing the cases. In the absence of some other duty or relationship of the defendant to plaintiff, it does not suffice for tort liability that defendant's offensive conduct is an intentional act. The conduct must be designed to cause severe mental or emotional distress, whether for its own sake or as a means to some other end, and it must qualify as extraordinary conduct that a reasonable jury could find to be beyond the farthest reach of socially tolerable behavior. *Hall v. The May Dept. Stores, supra,* 292 Or at 137. Here the use of plaintiff's picture, of course, was intentional, but there is no claim or evidence that the broadcaster wished to distress plaintiff. Plaintiff does not charge defendant with the tortious intentional infliction of severe emotional distress. The duty defendant is said to have violated is a duty not to invade plaintiff's "privacy" in the two ways stated above, by "appropriating" and by "publicizing" his picture.

## II.   NATURE OF "PRIVACY" INTERESTS

"Privacy" denotes a personal or cultural value placed on seclusion or personal control over access to places or things, thoughts or acts. "Privacy" also can be used to label one or more legally recognized interests, and this court has so used the term in several cases since *Hinish.* But like the older word "property," which it partially overlaps, "privacy" has been a difficult legal concept to delimit.[5] Lawyers and theorists debate the nature of the interests that privacy law means to protect, the criteria of wrongful invasions of those interests, and the matching of remedies to the identified interests. These questions confront us in the present case.

Thirty years ago, Professors Harper and James placed tort actions for "invasion of privacy" in their chapter

---

[5] Privacy began to replace property as the interest said to be protected against unreasonable searches in the United States Supreme Court's jurisprudence after *Katz v. United States,* 389 US 347, 88 S Ct 507, 19 L Ed 2d 576 (1967). For expansion of "property" to include various economic expectations, *see, e.g., Regents of the University of Michigan v. Ewing,* No. 84-1273 (D DC Dec. 12, 1985), *Board of Regents v. Roth,* 408 US 564, 576-78, 92 S Ct 2701, 33 L Ed 2d 548 (1972); Reich, *The New Property,* 73 Yale L J 733 (1964); Tribe, *American Constitutional Law,* 514-22 (1978).

on "Recovery for Emotional Disturbance," recognizing that psychic or emotional reactions simultaneously defined both the injured interest and the harm resulting from its infringement. Harper and James, The Law of Torts 677-91 (1956). They thought that the "astonishing enthusiasm" for invasion of privacy as an independent cause of action reflected technological and social pressures creating "many new sensitivities," but they noted that the new concept quickly became "a catchall for a great number of cases in which mental suffering or emotional distress was the primary injury sustained and for which no other substantive theory for relief was available." *Id.* at 682-84. Others questioned whether the phrase helpfully consolidated or merely obscured different torts. The second Restatement of Torts, following the work of its original Reporter, Dean Prosser,[6] noted that "invasion of the right of privacy" mixed four distinct wrongs, related not by similarity of defendants' acts but only by "the interest of the individual in leading, to some reasonable extent, a secluded and private life, free from the prying eyes, ears and publications of others." Restatement, Second, Torts § 652A, comment *b* (1977). The Restatement defined these distinct wrongs as "intrusion upon seclusion" (§ 652B), "appropriation of name or likeness" (§ 652C), "publicity given to private life" (§ 652D), and "publicity placing person in false light" (§ 652E). The exact formulations of the Restatements are not necessarily authoritative statements of the law of this state, *see U. S. National Bank v. Fought,* 291 Or 201, 213 n 12, and *id.* at 226-27, 630 P2d 337 (1981) (Linde, J. concurring); *Brewer v. Erwin,* 287 Or 435, 455 n 12, 600 P2d 398 (1979), but accepting the classification for convenience, plaintiff makes no claim that the broadcaster's cameraman intruded on a scene of seclusion or that the pictures broadcast by defendant placed plaintiff in a false light. As stated above, plaintiff claims that the broadcasts gave offensive publicity to his private life and appropriated his image for defendant's gain.

The common law tort claim based solely on publicizing private facts that are true but not newsworthy has met critical response. *See, e.g.,* Zimmerman, *Requiem for a Heavyweight: A Farewell to Warren and Brandeis's Privacy Tort,* 68 Cornell L Rev 291 (1983), reviewing part of the extensive literature; Ellis, *Damages and the Privacy Tort: Sketching a*

---

[6] Prosser, *Privacy,* 48 Calif L Rev 383 (1960).

*"Legal Profile,"* 64 Iowa L Rev 1111 (1979); Kalven, *Privacy in Tort Law—Were Warren and Brandeis Wrong?,* 31 Law & Contemp Probs 326 (1966). Such a tort was not part of the "common law of England" adopted by Oregon in 1843, and after study it was rejected in England, the home of the common law, in favor of alternative theories.[7] Criticism has not implied a lack of sympathy with the feelings of persons whose past or present lives are brought to public attention against their own wishes; but the obstacles to defining when publicity as such is tortious, without more, are formidable.

What is "private" so as to make its publication offensive likely differs among communities, between generations, and among ethnic, religious, or other social groups, as well as among individuals.[8] Likewise, one reader's or viewer's "news" is another's tedium or trivia. The editorial judgment of what is "newsworthy" is not so readily submitted to the *ad hoc* review of a jury as the Court of Appeals believed. It is not properly a community standard. Even when some editors themselves vie to tailor "news" to satisfy popular tastes,[9]

---

[7] *See* Report of the Committee on Privacy (HMSO 1972) Cmnd 5012. For alternative judicial paths to the same ends, see Seipp, *English Judicial Recognition of a Right to Privacy,* 3 Oxford J Leg Stud 325 (1983).

[8] A number of sociological findings are discussed in Zimmerman, *supra,* at 332-35, 349-50. She quotes Velecky, *The Concept of Privacy,* in Privacy (J. Young ed. 1978), at 25:

> " 'Class, occupation, education, and status within various communities and organizations may significantly affect the way in which an individual thinks of himself as a "private" individual and what he understands by "the moral right to privacy".' "

Zimmerman, *supra* at 349 n 304. There are suggestions that sociological fashion could once again swing from relativism to a new theory of innate or "natural" values, in the form of the genetic determinism of sociobiology. *See* Hirshleifer, *Privacy: Its Origin, Function, and Future,* 9 J Legal Studies 649 (1980).

[9] Bezanson, *Public Disclosure as News: Injunctive Relief and Newsworthiness in Privacy Actions Involving the Press,* 64 Iowa L Rev 1061, 1066-76 (1979), distinguishes "news" from "history" by factors of immediacy in time or locale and proposes to test the "newsworthiness" of a disclosure of private facts by the contribution it makes to the substance or to the impact of reporting some "public" event. The test fails when the primary interest of large segments of the public is "news" of the private lives of known personalities and of dramatic events in the lives of otherwise anonymous persons.

Former Dean Hulteng of the University of Oregon School of Journalism recently cited examples of non-"newsworthy" reporting, such as "the running story of a dying child who got her last wish — a trip to Hawaii — and then was dogged every step every day by photographers who milked the saga for every possible sob, every pathetic

others may believe that the community should see or hear facts or ideas that the majority finds uninteresting or offensive.

If the tort is defined to protect a plaintiff's interest in nondisclosure only against widespread publicity, as in the Restatement's § 652D, it singles out the print, film, and broadcast media for legal restraints that will not be applied to gossipmongers in neighborhood taverns or card parties, to letter writers or telephone tattlers. *See* Zimmerman, *supra,* at 300-03, 332-41. Finally, a successful tort action may serve to rectify a defamatory, appropriative, or "false light" publication, but in the pure "private facts" tort even success sacrifices rather than protects the plaintiff's interest in the privacy of the wrongfully publicized facts, for litigation only breeds renewed and often wider publicity, this time unquestionably privileged.[10] Writing in 1979, Professor Dorsey D. Ellis, Jr., found that there had been no reported case in which a plaintiff successfully recovered damages for truthful disclosure by the press since the United States Supreme Court reversed a New York judgment in *Time, Inc. v. Hill,* 385 US 374, 87 S Ct 534, 17 L Ed 2d 456 (1967), and he concluded that the tort's "very existence is in doubt, at least outside the law reviews." Ellis, *Damages and the Privacy Tort: Sketching a Legal Profile,* 64 Iowa L Rev 1111, 1133 (1979).

## III. PICTORIAL REPRESENTATION

Discussion of the tort often assumes that what the plaintiff objects to is the reporting of past or present "facts" or "information" by traditional forms of written publication.

---

image," in an article describing the competitive pressures for circulation and audience ratings. Hulteng, *Privacy vs. The Press,* The Stanford Magazine, Fall 1985, at 34.

Brandeis and Warren believed, and Judge Posner does not, that the press creates the demand for shocking, scandalous, pathetic, or titillating "human interest" news by providing a supply. *See* Warren and Brandeis, *The Right to Privacy,* 4 Harv L Rev 193, 196 (1890); Posner, *The Right of Privacy,* 12 Ga L Rev 393, 396 (1978). Whatever fowl first laid this egg or first was hatched from it, the editors of newsmagazines and news broadcasts unquestionably have felt driven to compete for the audience for such material.

[10] Even assuming that the more logical remedy against wrongfully publicizing private facts is to enjoin the defendant's publication, *see* Bezanson, *supra;* Pound, *Equitable Relief Against Defamation,* 29 Harv L Rev 640, 654-55 (1916), despite the so-called "presumption" against prior restraints, media reporting of the facts pleaded and presented in the legal proceedings undercut the effectiveness of that remedy.

The classic illustration is *Sidis v. F-R Pub. Corporation,* 113 F2d 806 (2nd Cir), *cert den* 311 US 711, (1940), in which the New Yorker magazine was absolved from tort liability for publishing the story of a one-time child prodigy who had long lived a life of somewhat eccentric obscurity. Arguably, the widespread dissemination of a person's picture, which television has made the essence of much otherwise unremarkable as well as of traditional "news," sacrifices the pictured person's privacy in a sense distinct from disclosure of factual information.

Claims to a right to prevent unconsented use of one's likeness in fact long antedate the advent of television. The first decisions respectively rejecting and accepting a "privacy" basis for such claims, *Roberson v. Rochester Folding Box Co.,* 171 NY 538, 64 NE 442 (1902), and *Pavesich v. New England Life Ins. Co.,* 122 Ga 190, 50 SE 68 (1905), involved commercial use of plaintiffs' pictures.[11] Sensitivity about reproduction of one's likeness is not a 19th century refinement of western civilization, as is sometimes supposed; many cultures have feared the magical power conferred by possession of a person's image. The settlers who brought the commonlaw to the Oregon Territory could find that this sensitivity preceded their arrival. Northwest native people such as the Chinook, according to Herbert Spencer, "if photographed, 'fancied that their spirit thus passed into the keeping of others, who could torment it at pleasure,'" an apprehension that plaintiff, at least, would not consider unrealistic today.[12] Civil law systems derive limits on the unconsented publication of photographs

---

[11] *See also Atkinson v. Doherty & Co.,* 121 Mich 372, 80 NW 285 (1899); *Moore v. Rugg,* 44 Minn 28, 46 NW 141 (1890); *Marks v. Jaffa,* 6 Misc 290, 26 NYS 908 (1893); *Manola v. Stevens,* NY Times, June 21, 1890 at 2, col. 2 (NY Sup Ct, June 20, 1890), *Pollard v. Photographic Co.,* 40 Ch Div 345 (1888). Additional early cases are described in Fitzpatrick, *The Unauthorized Publication of Photographs,* 20 Geo L J 134 (1932).

[12] Spencer cited observations by H. H. Bancroft (The Native Races of the Pacific States of North America (1875-6)) and Catlin (Illustrations of the North American Indians, with Letters and Notes (1876)) and reported similar aversions among the Okanagan, Mapuches, Mandan, and other peoples. 1 Spencer, Principles of Sociology, 245, 311 (1898). *See also* Warner, A Black Civilization, 196-77 (1958) (the Murgin of Australia); Frazer, 1 The Golden Bough, 55-70 (1935) (instances of the widespread use of "homeopathic magic" to injure a person through his image).

Shils, *Privacy; Its Constitution and Vicissitudes,* 31 Law & Contemp Probs 281 (1966), relates modern views of privacy to urbanization and industrialization.

by subsuming a right to one's own likeness under a "right of personality."[13]

Doubtless in many instances a picture not only is worth a thousand words to a publisher but words would be worth nothing at all. The respective editors would not likely have thought it worthwhile to publish a written report that Mrs. Graham had her dress blown by air jets at an amusement park, *see Daily Times Democrat v. Graham,* 276 Ala 380, 162 So2d 474 (1964), or that Mr. and Mrs. Gill showed affection characteristic of "love at first sight," *see Gill v. Curtis Pub. Co.,* 38 Cal 2d 273, 239 P2d 630 (1952). Some filmed or broadcast scenes compare to verbal reports in dramatic impact about as much as hearing music compares to reading a score, and the emotional reaction of the person who is depicted rather than described may likewise be greater. In *Commonwealth v. Wiseman,* 356 Mass 251, 249 NE2d 610, *cert den* 398 US 960, (1969), Massachusetts courts restricted the showing of a film of the conditions and treatment of mental patients in a state institution, a subject whose obvious public importance would have prevented censorship of written documentation.[14]

■ Nonetheless, the difference between undesired publicity by word or by picture seems to concern only the degree of the subject's psychic discomfort rather than the nature of the interest claimed to be invaded. Perhaps the present plaintiff would not have felt offended if KATU-TV had verbally described his bloodied and disheveled condition rather than showing it. But neither the courts nor the commentators have

---

[13] *See* Wagner, *Photography and the Right to Privacy: The French and American Approaches,* 25 Cath Law 195 (1980) (describing cases similar to American decisions under "privacy"); Krause, *The Right to Privacy in Germany—Pointers for American Legislation,* 1965 Duke L J 481; Pound, *Interests of Personality,* 28 Harv L Rev 343, 362-64 (1915).

[14] The decision rested on the filmmaker's breach of contractual conditions rather than invasion of the patients' privacy. A federal court earlier denied an injunction against showing Wiseman's film, "Titicut Follies," on First Amendment grounds, *Cullen v. Grove Press, Inc.,* 276 F Supp 727 (SDNY 1967). When patients are confined in a state institution, the issues of their unconsented exposure are complicated by possible "privacy" or other legal rights against governmental action, *see, e.g., Sterling v. Cupp,* 290 Or 611, 625 P2d 123 (1981) (citing standards for prisoners' dignitary rights).

Our reference to the *Graham, Gill,* and *Wiseman* cases does not imply that their results would be correct under Oregon law.

made a distinction in principle between one woman's objections to a book based on her experiences, *Cason v. Baskin,* 155 Fla 198, 20 So2d 243 (1944), and another's to a motion picture, *Melvin v. Reid,* 112 Cal App 285, 297 P 91 (1931), and we perceive none.

A distinction has been perceived, however, between publicizing a person's name, image, or other identifying facts for some intrinsic interest or for purposes of advertising someone's products or services. As already noted, the early decisions for and against claims based on "privacy," *Pavesich v. New England Life Ins. Co., supra,* and *Roberson v. Rochester Folding Box Co., supra,* involved commercial use of plaintiffs' pictures to advertise, respectively, life insurance and a brand of flour. When the New York Court of Appeals declined to hold that defendants' unconsented use of a young woman's picture to advertise flour was an invasion of a right to privacy under existing law, the New York legislature by statute provided for damages as well as injunctive relief against using "the name, portrait or picture" of any person "for advertising purposes, or for the purposes of trade without the written consent first obtained."[15] Many of the reported "privacy" cases are interpretations of this and similar statutes, which necessarily require courts to decide what is an "advertising purpose" or a "purpose of trade." Some courts have reached comparable decisions without statutes.[16]

Plaintiff in the present case concedes that KATU-TV would not be liable to him if it had included his picture in the ordinary news coverage of a traffic accident. He contends that the broadcaster became liable because instead it used the footage to draw audience attention to a later broadcast concerning emergency medical services, in which plaintiff's picture was not included. Does the distinction between "commercial" and "noncommercial" use of a person's name, likeness,

---

[15] The statute also makes violation a misdemeanor. N.Y. Civ. Rights Law §§ 50, 51 (McKinney 1976). A recent review of *Roberson* and its critical reception is contained in Savell, *Right of Privacy - Appropriation of a Person's Name, Portrait, or Picture for Advertising or Trade Purposes Without Prior Written Consent: History and Scope in New York,* 48 Alb L Rev 1, 6-14 (1983).

[16] *See* 21 Okla Stat Ann §§ 839.1 - 839.3 (West 1983); Utah Code Ann §§ 76-9-405, 76-9-406 (1978); Va Code §§ 8.01-40, 18.2-216.1 (1977). Other privacy related statutes include Cal Civ Code § 3344 (West 1985); Fla Stat Ann § 794.03 (1941).

An annotation, *Invasion of Privacy by Use of Plaintiff's Name or Likeness in Advertising,* 23 ALR3d 865-924 (1969), reviews many cases in and outside New York.

or life history rest on a difference in the interest invaded by the publication or in the character of the publisher's motives and purposes? The reason should bear on the remedy.

■ When actors, athletes or other performers object, not to a loss of anonymity, but to unauthorized exploitation of their valuable public identities, the remedy should reflect the wrongful appropriation of a "right to publicity" that has economic value to the plaintiff as well as to the defendant, rather than damages for psychic distress at a loss of "privacy." *See, e.g., Grant v. Esquire, Inc.,* 367 F Supp 876, 879-81 (SDNY 1973) (actor's face superimposed on figure wearing coat featured in fashion story); *Haelen Laboratories v. Topps Chewing Gum,* 202 F2d 866 (2d Cir), *cert den* 346 US 816, (1953); Ellis, *supra,* 64 Iowa L Rev at 1128, 1131-33.[17] When a person who neither has nor wants a marketable public identity demands damages for unauthorized publicity, such a person may claim injury to a noneconomic rather than an economic interest in his or her privacy; but it is not always obvious, as it is not in this case, why the loss of privacy is different when it occurs in a "commercial" rather than a "noncommercial" form of publication. If the plaintiff can show no psychic injury at all, for instance an infant whose picture has been used in an advertisement for baby food rather than in a magazine or television report on child care, the answer must be that the advertiser, but not the reporter, has unjustly enriched himself by appropriating something for which he is expected to pay, an answer that begs the question.[18]

■ Our system relies for freedom of information, ideas, and entertainment, high or low, primarily on privately owned

---

[17] Judge Frank appears to have coined the phrase "right to publicity" in *Haelen Laboratories v. Topps Chewing Gum, supra,* 202 F2d at 868, in referring to "prominent persons (especially actors and ball-players) [who], far from having their feelings bruised through public exposure of their likeness, would feel sorely deprived if they no longer received money for authorizing advertisements, popularizing their countenance, displayed in newspapers, magazines, buses, trains and subways." Of course, once a publication is wrongful for this or for another independent reason, a celebrity is not disqualified from recovery for any actual noneconomic, emotional injury if it is of a kind that reasonably could be expected from a publication of that nature. *Grant v. Esquire, Inc., supra,* 367 F Supp at 881.

[18] A recent Maryland decision assumed that infants whose pictures were used in a newspaper's advertising campaign could state no purely economic claim of unjust enrichment by the appropriation of their images unless they also had a tort claim for invasion of privacy. *Lawrence v. A. S. Abell Co.,* 299 Md 697, 475 A2d 448 (1984).

media of communication, operating at private cost and seeking private profit. Books, newspapers, films, and broadcasts are produced and distributed at private cost and for private profit, that is to say, "commercially," and the use of materials from the lives of living persons in such publications can enrich authors, photographers, and publishers just as their use in advertisements, for instance the writers and publishers of the New Yorker magazine in *Sidis v. F-R Pub. Corporation, supra.* This predictably causes problems in applying a test such as New York's "advertising" or "purposes of trade," when "the reproduction of names and photographs properly published for news or public interest purposes has also served to sell and advertise the medium in which they were contained," as Justice Breitel noted in *Booth v. Curtis Publishing Company,* 15 AD 343, 223 NYS2d 737, 739 (Sup Ct), *aff'd* 11 NY2d 907, 228 NYS2d 468, 182 NE2d 812 (1962). *Compare, e.g., Stephano v. News Group Publications, Inc.,* 64 NY2d 174, 485 NYS2d 220, 474 NE2d 580 (1984) (use of model's picture in magazine report on fashions not for "purposes of trade" even if published to increase circulation), *with Thompson v. Close-Up, Inc.,* 277 AD 848, 98 NYS2d 300 (1950) (where picture is unrelated to article, use of picture to increase magazine's circulation may be for "purposes of trade"); *see also Griffin v. Medical Soc. of New York,* 7 Misc 2d 549, 11 NYS2d 109 (1939) (article by physicians in a medical journal might be found to be written to advertise their professional accomplishments). Publication of an accident victim's photograph is not appropriation for commercial use simply because the medium itself is operated for profit. *Leverton v. Curtis Publishing Co.,* 192 F2d 974 (3rd Cir 1951) (applying Pennsylvania law).

■■ There is another reason why an unauthorized use of a person's name or image to sell goods or services can be a tortious appropriation when the same use in the content of material published to be sold is not. The use may make it appear that the person has consented to endorse the advertised product, with or without being paid to do so. When that impression is in fact false, the appropriation of the person's identity places the person in a false light much as the unauthorized use of Mr. Hinish's name in the political telegram did in *Hinish v. Meier & Frank Co., supra.* Such an inference is most likely to be drawn about professional performers, who are widely known to be paid for endorsing products in print

and television advertisements and even for using their sponsors' sports clothes and equipment in their work. They have been allowed to prevent the exploitation of their public identities even to promote the publication in which they are depicted. *See Cher v. Forum International, Ltd.*, 692 F2d 634 (9th Cir 1982), *cert den* 462 US 1120, (1983) (applying California law). The right is not limited to professionals; in an early New Jersey case, the inventor Thomas Edison won an injunction against the use of his image and a fictitious endorsement on medicine labels. *Edison v. Edison Polyform & Mfg. Co.*, 73 NJ Eq 136, 67 A 392 (1907).[19]

■    This theory is not available, however, to a person whose image, with no established public familiarity, appears in a commercial context only incidentally, perhaps as one of several persons in a public scene, or otherwise under circumstances that plainly are not presented so as to convey any endorsement by that person. The New York statute has been held not to cover the use of a photograph of family members of a public figure whose magazine article was advertised on television, *Friedan v. Friedan*, 414 F Supp 7 (SDNY 1976), or the use on a book cover of a photograph showing plaintiff in conversation with a clergyman who was the subject of the book, *Dallesandro v. Henry Holt and Company*, 4 AD 2d 470, 166 NYS2d 805 (1957).[20]

■    In the present case, plaintiff does not claim that KATU-TV's promotional spots portrayed him as an accident victim in a manner implying that he endorsed its forthcoming program about emergency medical services, and the record on summary judgment suggests no such inference. His claim is not for the economic value of such an endorsement, nor for any gain unjustly realized by the broadcaster from appropriating a photograph belonging to plaintiff. The videotape was

---

[19] *See also Fairfield v. American Photocopy Equipment Co.*, 138 Cal App 2d 82, 291 P2d 194 (1955) (unauthorized and false use of lawyer's name in advertising copying machine held invasion of privacy). A Wisconsin decision denied an injunction against selling cigars identified by the name "Franklin D. Roosevelt" in the absence of a statutory basis, but Roosevelt was not the plaintiff and there was no claim of endorsement. *Prest v. Stein*, 220 Wis 354, 265 NW 85 (1936).

[20] An appearance of endorsement has been held unnecessary under the California statute, *supra* note 15. *See Eastwood v. Superior Ct. for Los Angeles Cty.*, 149 Cal App 3d 409, 198 Cal Rptr 342 (1983), *citing Stilson v. Reader's Digest Ass'n, Inc.*, 28 Cal App 3d 270, 104 Cal Rptr 581 (1972), *cert den* 411 US 952, (1973).

made at the accident scene by defendant's cameraman, and the identity of the accident victim was immaterial. Rather, plaintiff claims damages for mental distress from its publication. Without a showing that plaintiff's picture was either obtained or broadcast in a manner or for a purpose wrongful beyond the unconsented publication itself, that claim fails.

## IV. CONCLUSION

To summarize, we conclude that in Oregon the truthful presentation of facts concerning a person, even facts that a reasonable person would wish to keep private and that are not "newsworthy," does not give rise to common-law tort liability for damages for mental or emotional distress, unless the manner or purpose of defendant's conduct is wrongful in some respect apart from causing the plaintiff's hurt feelings. For instance, a defendant might incur liability for purposely inflicting emotional distress by publishing private information in a socially intolerable way, *cf. Hall v. The May Dept. Stores, supra;* or the publicized information might be wrongfully obtained by conversion, bribery, false pretenses, or trespassory intrusion, *see McLain v. Boise Cascade Corp., supra,* or published by a photographer who has been paid for what the subject reasonably expects to be the exclusive use of a picture; or when a defendant disregards a duty of confidentiality or other statutory duty, *see Humphers v. First Interstate Bank, supra,* or exploits a distinctive economic value of an individual's identity or image beyond that of other similar persons for purposes of associating it with a commercial product or service, although this court has not decided all such issues. And, of course, the distressing report or presentation of a person's private affairs might not be truthful, *see Tollefson v. Price, supra; Hinish v. Meier & Frank, supra.* Because plaintiff has shown no such wrongful element in defendants' conduct, we have no occasion to anticipate constitutional questions in the event the legislature were to enter this field of tort law.

The decision of the Court of Appeals is reversed, and the judgment of the circuit court is reinstated.